BARRETT ET AL. *v.* DORR ET AL.

[No. 20,104. Filed December 2, 1965. Rehearing denied January 6, 1966. Transfer denied February 8, 1967.]

*Steven C. Bach,* of Mount Vernon, *William L. Mitchell,* of Evansville, and *Robert Hollowell,* of Indianapolis, and *Hollowell, Hamill & Price,* of counsel, of Indianapolis, all for appellants.

*Joseph B. Minor,* of Evansville, and *Otis B. Allen,* of Mount Vernon, both for appellees.

PRIME, C. J.—Before proceeding to a discussion of this matter on the merits, we note that the appellees have included in their answer brief a Motion to Dismiss. This motion is not properly presented under Rule 2-12 of the Supreme Court in any particular and is hereby denied.

This is an action by appellants against appellees to quiet title to certain real estate and to have an oil and gas lease cancelled because of failure to operate and produce an oil well on said property.

The lease was executed by a prior owner of the land and subsequently a producing well was drilled on the property. By reason of assignments and overriding royalty interests, numerous parties are appellees herein.

The complaint in two paragraphs and a supplemental complaint alleged that the lease and assignments expired because of failure to produce and operate for an unreasonable period of time of approximately 11 months. The prayer was to quiet title and for an accounting.

A cross-complaint was filed against the plaintiffs alleging that the engine pumping the well had been removed by the plaintiffs and recovery of approximately $1200 in damages was asked.

Briefly, the facts of the case are that the appellants became owners of the land involved here in 1950. In 1956, a producing oil well was drilled on the real estate and oil was produced in paying quantities until March 20, 1960. During this time all parties received their proportionate shares of the oil produced and the money received. After March 20, 1960, production of the well dropped and no oil was produced, except for a few days which were in dispute. The appellees contend that owing to rain and floods the well could not be operated and that the appellees, being owners of fractional parts of the lease, were scattered and by reason of lack of communication and information did not know that the well was not being produced properly. That in July, 1961, a new operator, or pumper, was hired and that production of the well was increased from about 6 barrels per day to 21 barrels per day.

The issues were tried by the court without the intervention of a jury. Special findings and conclusions of law were entered and judgment was rendered for the appellees thereon.

The following paragraph is the part of the lease requiring interpretation and application:

"It is agreed that this lease shall remain in force for a term of Five years from date, and as long *thereafter* as oil or gas, or either of them, is produced from said land by lessee, and or if lessee shall commence drilling operations at any time while this lease is in force this lease shall remain in force and its terms shall continue so long as such operation(s) continue with due dilligence and if production results therefrom then as long as production continues." (Emphasis added)

We set out herewith a summary of the facts found by the court which are necessary to a determination of the questions presented here.

No. 1—That the plaintiffs (appellants) were the owners of the real estate in fee simple subject to the two oil and gas leases set out.

That a producing oil well was drilled on the real estate in 1956 and the legal owners of the well were set out showing their various shares.

No. 2—That the oil well was equipped for production and was produced in paying quantities until March 20, 1960. That all parties received their proper shares of the oil.

No. 3—That due to the weather, floods, the condition of the roads, said well could not be produced continuously from March 21, 1960, to March 19, 1961. That there were times from March, 1960, to March, 1961, when said well could have been produced and said well was produced at times during said period by undisclosed parties and said oil was sold from the tanks or taken from the tanks by undisclosed parties. That during said period of time Howard Atha was the operator of the lease and in July, 1961, he was discharged and Elmo Holder was employed to operate said oil well. That since that time the production of the well has been increased from 6 barrels daily to 21 barrels daily after certain repairs to the pump and equipment had been made.

No. 4—That the owners of the working interests have paid all expenses of operation and are the owners of the equipment and casing.

No. 5—That the plaintiffs at no time notified the defendants that they intended to cancel said lease until this law suit was filed.

No. 6—That plaintiffs filed suit on June 3, 1961, at which time the well was being produced by the defendants owning the working interests.

No. 7—That there was no intention by the defendants to cease operations.

No. 8—That the defendants did not abandon said oil well.

No. 9—That the defendants owning the working interests have had expenses to the present time of $35,973.44 and have received from production $18,599.50.

No. 10—That the lease on which the well is located has a present estimated value of $300,000.00.

No. 11—That the plaintiffs have suffered no damages as a result of the non-production of said well from March 21, 1960, to March 19, 1961. That there was no drainage and the increased production will repay the plaintiff for the loss of production.

No. 12—That the plaintiff, Carl L. Barrett, removed the engine used on said well without permission of the working owners on September 21, 1961, and refused to return it until November 21, 1961. That the engine was damaged in the amount of $100.00 while removed.

The conclusions of law were as follows:

"1. The law of equity is with the defendants and against plaintiffs and the defendants interest in said lease and mineral rights under said estate will not be cancelled.

"2. That the plaintiff, Carl A. Barrett, as a result of removing the engine from said well has damaged the defendants, . . ., in the sum of $100.00."

(Judgment, May 31, 1963.)

A motion for new trial was filed and overruled and is assigned as error.

The grounds of the motion for new trial were:

1. Irregularity in the proceedings:—
   a. Misconduct of counsel in writing a letter to the trial judge setting out certain citations and arguments therein to influence the judge in arriving at a decision.
   b. Notes made by the court on said letter without the knowledge of plaintiffs or counsel.
2. The decision of the court is not sustained by sufficient evidence.
3. The decision of the court is contrary to law.

4. The court erred in sustaining the objection of the defendants to a question directed to Charles White, a witness for plaintiffs; for the purpose of impeaching a witness for the defendants, the foundation having been laid.

The first ground is not urged in the argument portion of the appellant's brief, and presents no question for ■ our consideration. Rules of the Supreme Court of Indiana 2-17(e).

We have considered the fourth ground in the motion and, while admitting that appellant is correct in his contention that the question might be proper, after the laying of ■ proper foundation, we do not see that the point constitutes reversible error or that the decision would have been affected. This was an impeaching question and was therefore a matter on which the trial court had wide discretion. Acts 1881 (Spec. Sess.) Ch. 38, #286, p. 240, being § 2-1727, Burns' 1946 Repl.

Specifications No. 2 and No. 3 are grouped in one argument and will be so considered.

Our courts have been vexed for many years in connection with the question of the effect of a failure by lessees to operate oil wells and market the product after oil has been discovered.

We are thus here confronted with the obligation to determine if the lease in question expired by its own terms of limitation and if the appellees had abandoned the lease or whether, by their actions, reasonably diligent efforts were made to conform to the terms of the lease and continue production.

The appellants submit a considerable number of cases touching upon this point:

In *New American Oil, etc. Co.* v. *Troyer* (1906), 166 Ind. 402, 411, 76 N. E. 253, reh. 77 N. E. 739, the court said:

"The peculiar, wandering character of gas and oil precludes ownership in their natural state, and hence they

are not the subjects of sale and conveyances until they have been reduced to possession and placed under control by being diverted from their natural paths into artificial receptacles. In such cases the real subject of the contract is the mining of the gas or oil that may be found, on the terms specified. The preliminary exploring is a mere incident that goes for nothing if unsuccessful, and unless oil or gas is found in paying quantities, then there is and was not at the inception of the contract anything to which it could attach. So the title in such contract is at least inchoate until the result of the drilling is ascertained. And if barren territory is developed then there is no lease, no continuing contract, no conveyance of title, because there is nothing to pass under the agreement. . . ."

In *Dill* v. *Fraze* (1907), 169 Ind. 53, 58, 79 N. E. 971, the court said:

"The wandering and vagrant character of oil and gas is recognized by the courts, and contracts pertaining thereto are to be construed with reference to the known characteristics of the business. . . . The injustice to a landowner of withdrawing through neighboring wells the oil or gas which is under his soil, while the development of his property, by himself or others, is prevented by a contract, resting upon a nominal consideration, is obvious. It is not, therefore, to be supposed that a landowner would tie up his property in the oil belt for sixty days upon the nominal consideration of $1, except as he was moved thereto by the supposition that his property would be explored within that time, and afterwards developed, if the result of the exploration warranted it, and in such a case, although the contract may authorize a further delay, upon payment of a stipulated price therefor, to afford the operator an opportnuity to consummate his arrangements, yet the courts can but regard a provision for a forfeiture in such a case as of the essence of the contract. . . ." (And cases cited)

In *Stanolind Oil & Gas Co.* v. *Guertzgen*, 100 F. 2d 299, 300, (CCA 9th, 1938), the court said:

"Oil and gas leases deal with property of a highly speculative nature, and the protection of the interests of the lessor is considered of paramount importance. In *Solberg* v. *Sunburst Oil Company*, 76 Mont. 254, 246 P. 168, it is declared that (page 172) 'the well-known rules of

construction of contracts have, in case of oil and gas leases, been modified to meet the new conditions arising by reason of the new industry, and such modification is necessary for the protection of the interests of the landowner and of the public generally.' The Montana courts have consistently declared that in connection with such leases forfeitures are favored by the law. 'Defendants argue that the courts view forfeitures with disfavor and will enforce them only when the strict letter of the contract requires it. This is a correct statement of a general principle of law, but in connection with oil and gas leases, forfeitures are favored by the law. . . .' "

See also: 24 Am. Jur., *Gas & Oil*, §§ 44 and 45, p. 551. Here the primary or definite terms had expired and the rights of the lessees and those holding under them must exist, if at all, under the "thereafter" clause. The drilling and production of oil in the primary term created a determinable fee which is limited by the "thereafter" clause to so long as oil is produced and when oil is no longer produced, it expires by its own terms.

In the case of *Haby* v. *Stanolind Oil & Gas Company*, 228 F. 2d 298, (CCA 5th, 1956), the court said at page 305:

"Under the law of Texas, the lessee's estate created by an oil and gas lease, such as the one in this case, is a determinable fee, and the 'thereafter' or 'production' clause is a special limitation upon the lessee's estate. . . . (And cases cited) ; see also, 31 C. J. S. *Estates*, § 10; 19 Am. Jur., *Estates*, § 28.

' "It appears to be very well settled that under the terms of the lease, upon cessation of production after termination of the primary term, the lease automatically terminated. *W. T. Waggoner Estate* v. *Sigler Oil Co.*, 118 Tex. 509, 19 S. W. 2d 27." *Watson* v. *Rochmill*, 137 Tex. 565, 155 S. W. 2d 783, 784, 137 ALR 1032.' "

In *Oceana Oil Producers* v. *Portland Silo Co.* (1951), 229 Ind. 656, 661, 100 N. E. 2d 895, the court said:

"The contract is the written gas and oil lease, pertinent parts of which are noted above. The right of appellant to

hold the premises are limited thus: 'to have and to hold the said premises for and during the term of five years from the date hereof (May 31, 1924) and as much longer as oil or gas is found or produced in paying quantities thereon.' The date when oil and gas ceased to be found or produced in paying quantities thereon is very definitely fixed by the date of the last royalty check issued to appellee and being April 10, 1945. At that time appellant's right to occupy the premises under the lease ceased and it then became its duty within a reasonable time thereafter to remove its property from the premises, 'and leave the tilling in as good order as found.' The rule in Indiana seems to be that 'where the right to remove property "at any time" has been reserved in the lease, such a right is not unlimited as to time but is limited to a reasonable time after the expiration of the lease.' . . ." (And cases cited.)

In *United States* v. *Brown* (1926), 15 F. 2d 565 (Dist. Ct. Okla. 1926), at p. 567, the court said:

"The lease has been continued in force since along in 1921 by reason of the provision, 'and as long thereafter as oil or gas is found in paying quantities' and by the payment of an annual royalty on a producing gas well. Certainly, as soon as oil or gas is not found in paying quantities and as soon as there is no producing gas well upon the premises, the lease expires according to its very terms. The payment of a royalty, when no royalty is due, cannot continue a lease in force which has expired by virtue of its own terms and provisions. . . ."

In *Gillespie* v. *Wagoner*, 190 N. E. 2d 765, 766, (1963 Ill. Sup. Ct.), the court said:

"The general rule has been stated in the following language: 'If the lessee by producing oil or gas within or at the end of the definite term, has satisfied the contingency upon which the lease is to continue beyond that term, it is the plain intent of the "thereafter" clause that the lease shall continue as long as oil or gas continues to be produced in paying quantities. From this it is clearly inferred that if production ceases the lease is at an end, although a temporary cessation of production does not terminate the lease under this limitation.' 2 Summers, Oil and Gas, Sec. 305."

and at page 767, the court said:

"We believe the proper rule to be that temporary cessation of production after the expiration of the primary term is not a cessation of production within the contemplation and meaning of the 'thereafter' clause if, in the light of all surrounding circumstances, reasonable diligence is being exercised by the lessee to continue production of oil or gas under the lease. See *Lamb* v. *Vansycle*, 205 Ky. 597, 266 S. W. 2d 523."

In 2 Summers, Oil & Gas, p. 239, it is said:

"Thus, where a lessee gave as an excuse for his failure to produce within the definite term the lack of water, muddy roads, weather conditons, sickness among employees, and his inability to secure coal and well casing because of government regulations, the Kansas court held that the lease did not contemplate that any circumstance or condition should excuse the lessee from performing the conditions of the lease on his part,' and that the lessee was bound to take notice of the topography and climatic conditions of the country, as well as the power of the federal government over the coal and iron industries."

On p. 241, it is further said:

" 'The main purpose of the lessor is to obtain diligent and skillful effort to make his mines yield him a profit, after the term as well as within it. If the lessee, having discovered minerals within the term, or contemporaneously with the expiration thereof, continues operations with diligence, he thereby obviously executes the chief purpose of the lease, and would be clearly within his rights, if within the term. To regard it as a compliance with the prescribed condition after the fixed term would be entirely consistent with the idea of extension or continuation of the tenancy, which is undoubtedly the major office or function of the clause. May we not, therefore, say the qualifying clause, "as long as the oil or gas is produced," really means "as long as the premises are diligently and efficiently operated, providing minerals shall have been discovered within the fixed term"? Which construction harmonizes the more completely and naturally with the manifest purposes of the parties as indicated by the other provisions of the lease, their situation, and the surrounding circumstances?' "

In *Owens* v. *Day*, 249 P. 2d 710, 711, (Okla. 1952), the court said:

"In these cases we held that where an oil and gas lease was for a specific term and as long thereafter as oil or gas was produced the lease expired upon the termination of production unless the failure to produce, as stated in *Woodruff* v. *Brady, supra,* was due to a bona fide attempt to increase production in the existing well."

It thus appears from the above decisions that upon the discovery of oil or gas there is an implied obligation on ■ the part of the lessee to continue the development of the leased premises with reasonable diligence.

We now attend to further authorities on the subject.

In *Rembarger et al.* v. *Losch* (1919), 70 Ind. App. 98, 103, 118 N. E. 831, the court says:

"It is also well settled, that while oil and gas leases in the first instance usually grant to the lessee merely the right to explore for such products, if such exploration and development is made in accordance with the terms of said lease, and oil and gas is produced thereby as therein provided, such lessee acquires an interest in such land. . . . *Ohio Oil Co.* v. *Griest* (1902), 30 Ind. App. 84, 65 N. E. 534; . . .; *Shenk* v. *Stahl* (1905), 35 Ind. App. 493, 74 N. E. 538; . . .; *Johnson* v. *Sidey* (1915), 59 Ind. App. 678, 109 N. E. 934. When an interest in real estate has been thus acquired by a lessee, it will not be forfeited, unless it clearly appears that it would be against equity to permit the lessee longer to assert such interest. *Gadbury* v. *Ohio Etc. Gas Co.* (1904), 162 Ind. 9, 67 N. E. 259, 62 L. R. A. 895." (And cases cited)

The court further says at page 104:

"While it is true that provisions for forfeitures in oil and gas leases are for the benefit of the lessor, and are more strictly enforced than in the ordinary lease between landlord and tenant, yet it is not a rule of universal application that all defaults made by the lessee entitle the lessor to declare a forfeiture, or to have a decree cancelling the lease. If such forfeiture be for the nonpayment of money or the performance of some other act, equity regards such

payment or performance as the real or principal intent and the forfeiture merely as an accessory, where time is not made of the essence of the contract, and will not enforce such forfeiture, where the actual damages sustained by the other party can be adequately compensated. Thornton, Oil and Gas (2d ed.) 262, § 187; . . .; *Lynch* v. *Versailles Gas Co.* (1895), 165 Pa. St. 518, 30 Atl. 984; *Edwards* v. *Iola Gas Co.* (1902), 65 Kan. 362, 69 Pac. 350; . . ." (And cases cited)

3 Summers, Oil and Gas, § 437, p. 53, states:

"In the second place, despite the long-continued repetition of the statement that equity abhors a forfeiture and never enforces one, the truth still is that equity does not favor hardship, will relieve against hardship, and will not be instrumental in enforcing a hardship, if it can be avoided. . . . When, however, the courts in this country realized that the enforcement of a forfeiture provision in an oil and gas lease did not necessarily result in hardship, but more often furnished an equitable adjustment of the differences of the lessor and lessee, they enforced them, if the power to forfeit was found to be clearly created by the lease. As this practice grew, particularly in the enforcement of the forfeiture provisions of the drill or pay clause, the courts, instead of stating that they enforced forfeitures of oil and gas leases because they found that such enforcement did not result in great hardship, merely stated from time to time, and often in cases where no forfeiture was involved, that equity favors forfeitures of oil and gas leases, thus perpetuating the apparent contradictions as to the attitude of equity towards forfeitures. . . ."

The author continues in Vol. 3, § 439, page 66, as follows:

"Most courts have adhered rather closely to the rule that forfeitures will not be enforced unless expressly created and have construed the language of the leases purporting to create powers of forfeiture strictly."

Touching upon the point of cancellation of leases and failure to produce, the appellees cite the following cases, which hold that the lease has only been terminated with a cessation of production or operation continued for a period of two years or more. *Heeter* v. *Hardy* (1948), 118 Ind. App. 256, 76 N. E.

2d 590; *Gadbury* v. *Ohio, etc., Gas Co.* (1904), 162 Ind. 9, 67 N. E. 259; *Spies* v. *DeMayo* (1947), 396 Ill. 255, 72 N. E. 2d 316. In the case of *Schaffner* v. *Benson* (1929), 90 Ind. App. 420, 423, 166 A. E. 881, the court stated:

> "Under the lease contract, the lessee was not required, upon completion of a nonproductive well, to drill another, nor to do anything with the one completed; nor was it required to remove the machinery or property used in constructing the well at any particular time. Whether appellee could have had the lease canceled at any time before the expiration of the five-year term, it is unnecessary to decide. It is sufficient to say that, under the facts stated in the finding, no steps were, in fact, taken by appellee to terminate the lease. . . ."

and the court continued:

> "Abandonment has been defined as the relinquishment of property to which a person is entitled, with no purpose of again claiming it, and without concern as to who may subsequently take possession; and, in considering the question before us, we must keep in mind the distinction between abandonment and laches. As has been said: 'Abandonment effectuates intention. Laches defeats intention. Abandonment is voluntary. Laches operates *in invitum*.'. . . To constitute an abandonment of property there must be a concurrence of the intention to abandon and an actual relinquishment. . . ." (And cases cited)

The appellants urge here that the appellees, by their failure to pump the well, were guilty of abandonment and that the lease became void; while the appellees contend that no intention to abandon was shown, and that the failure to pump the well was due to conditions beyond their control.

From the evidence here, it might be said that the appellees were delinquent or guilty of mis-management. However, with all their shortcomings, the lessees did produce oil, they did hire a new operator, they did install a new motor and they did increase production. The trial court decided that the steps taken indicated that the appellees did not intend to abandon the property. The appellants allege that failure to produce

oil for the period set out in the complaint rendered the lease void. The trial court found that such allegations had not been sustained and as there was evidence to support the same, we are bound by such findings.

Where there is evidence to sustain such findings of fact, this court will accept them as stated by the trial court. The trial court was in a position to hear the witnesses and to make a fair determination of the circumstances surrounding this matter. The evidence was conflicting and the court rendered its decision after considering the evidence submitted. We cannot say that the decision was contrary to law when such conflict in the evidence existed. It is only where the evidence is not in conflict and a decision is reached that reasonable minds or men would not have reached, that we can say such a decision is contrary to law. *Pokraka* v. *Lummus Co.* (1952), 230 Ind. 523, 104 N. E. 2d 669; *Hinds, Executor Etc.,* v. *McNair, et al.* (1956), 235 Ind. 34, 129 N. E. 2d 553; *Miller, etc.* v. *Ortman, etc., et al.* (1956), 235 Ind. 641, 665, 136 N. E. 2d 17.

The decision of the trial court here was not such a decision and we hold that it was not contrary to law.

The judgment is affirmed.

Carson and Wickens, JJ., concur.

Faulconer, J., concurs in result.

NOTE.—Reported in 212 N. E. 2d 29.