**PLYMOUTH FERTILIZER COMPANY INC.**, Appellant (Defendant and Counter-Claimant Below),

v.

Lavon R. **BALMER**, Eloise June Balmer, Appellees (Plaintiff, Counter-Defendants Below).

No. 3–185–A–17.

Court of Appeals of Indiana, Third District.

Feb. 11, 1986.

Rehearing Denied April 4, 1986.

Verner P. Partenheimer, Hall, Partenheimer & Kinkle, Princeton, Peter L. Rockaway, Plymouth, for appellant.

Robert J. Konopa, South Bend, for appellees.

STATON, Presiding Judge.

Plymouth Fertilizer Company, Inc. (Plymouth) appeals from a negative judgment which awarded LaVon and Eloise Balmer (Balmer) damages for conversion of natural gas. In this appeal the following issues were raised:

1) Did the trial court err by finding that the gas lease of April 25, 1962, was no longer valid;

2) Did the trial court err in valuing the converted gas;

3) Did the trial court err by denying Plymouth's motion to make "restitution in kind" by replacing the converted gas rather than paying its value; and

4) Did the trial court err in its award to Balmer for attorney's fees?

Issues 1, 2 and 3 are affirmed. Issue 4 is reversed.

## I.

### Lease

The trial court made the following findings:

"1. That prior to April 25, 1962, Peter Balmer, Jr., was the owner in fee simple of real estate situate in Marshall County, Indiana, and being the Southwest Quarter of Section 17, Township 34 North, Range 3 East, and containing 160 acres, more or less; and that on that date he, acting through his guardian, the said Peter Balmer, Jr. being incompetent, executed a certain oil and gas lease pertaining to the real estate to M.W. Howard, which lease appears of record in the Office of the Recorder of Marshall County, Indiana, as identified as Document No. 49696 in Miscellaneous Record LL at Page 351.

"2. That as a result of various assignments interest in said oil and gas lease was, by the said M.W. Howard, in varying factual [sic] interest, assigned to other persons, namely Harvey I. Sands and Sophia Sands, George Rogers, Howard Mauldin, Leo Yates, R.A. Hill, and Billie L. Miller.

"3. That the grantee of the lease, M.W. Howard, drilled a well producing gas only on the real estate in the autumn of the year 1962.

"4. That the grantor of the lease, the owner of the land, Peter J. Balmer, Jr., died in the year 1963, and as a result of which and by family settlement among his heirs the plaintiffs became the owners of a portion of the real estate described in paragraph 1 of this finding, or that it is to say the west one-half thereof, containing 80 acres more or less, that being the tract upon which the gas well was located and that the other half of said real estate, or that is to say the east one-half of the entire track, vested in one Bertha Balmer who has, however, assigned all of her interest in the claims against the defendant and with respect to the gas upon the 160 acre tract to the plaintiffs.

"5. That contemporaniously with the drilling or completion of the gas well, the lessee, M.W. Howard, was issued by the Indiana Department of Conservation, now the Department of Natural Resources, permit No. 26179 indicating that the well was completed October 11, 1962 as a gas well "to be used in farm dwelling until marketed".

"6. After the well became operational, the gas therein was used only for domestic purposes in the plaintiff's residence situate on the property and in a greenhouse built thereon and for drying crops, or that is to say for domestic purposes only.

"7. That gas from the well was never produced in "paying quantities" and that no market was ever developed therefore because of restricted quantifies [sic], a low BTU content and the cost of introducing it

into a pipeline or into an available market and that neither the lessee, M.W. Howard, or any of his assignees made any serious effort to attempt marketing that gas.

"8. That the lessee, M.W. Howard, made only one $50.00 shut-in rental payment in about the year 1963, and that there were no payments of shut-in rentals thereafter until one of the assignees, Howard Mauldin, made shut-in rental payments in about the years 1967, 1968 and 1969 and that no shut-in rentals were, by the lessees or assignees, paid to the owners of the land at any time since the year 1969; nor has there been any royalty paid to the lessors or the owners of the land nor have any other wells been drilled by the lessee or the assignees nor have there been any pooling arrangements or other development or production by the lessee, M.W. Howard or his assignees.

"9. That efforts by the plaintiffs to contact M.W. Howard, the operating lessee, failed and they were not, from the year 1963 able to contact him; and that while one of the assignees, Howard Mauldin, associated with the plaintiffs for a brief period of time this did not result in the resumption of development, production or the creation of a market for the gas and he paid shut-in rental for a short period or the period ending in 1969.

"10. That on May 18, 1973, the plaintiffs conveyed the real estate, that is the west one-half of the entire tract to Beulah B. Moore, reserving to the plaintiffs, however, "any and all interest in any and all gas and oil underlying the premises" granting, however, the said Beulah B. Moore the right to use the gas for the same domestic purposes for which the plaintiffs had theretofore been using it, and further reserving an easement of access to the well head.

"11. That about February 1979, the defendant, through its agent, Jay Read, commenced negotiations with the plaintiffs for purchase of the gas rights claimed by the plaintiffs working through the same attorney who, in obvious conflict of interest, caused an affidavit to be prepared and filed on behalf of the plaintiffs, that affidavit being the termination affidavit and recorded in the Office of the Recorder of Marshall County, Indiana, in Miscellaneous Record LL at Page 9056 and pursuant to Indiana Code 32–5–8–1.

"12. That the purpose of that affidavit and of its recording by the plaintiffs with the knowledge of the defendants was to make of record at that time the opinion of the plaintiffs that the gas lease had previously terminated and to eliminate outstanding claims consistent with the purpose of the plaintiffs and the defendants in obtaining clear title to gas rights to promote their own negotiations for the purchase of those gas rights of the plaintiff by the defendant.

"13. That negotiations between the plaintiffs and the defendants terminated.

"14. That subsequent to termination of negotiations and in September, 1980, assignments by the lessees of the oil and gas were obtained assigning all rights of the assignees to Beulah B. Moore, then owner in fee simple of the surface real estate but having, at that time, only an interest under her deed from the plaintiffs to use the gas for domestic purposes.

"15. That on June 29, 1981, the Beulah Moore interests were by the executors of her estate, she having then died, conveyed pursuant to a contract earlier entered into to the defendant.

"16. That in March, 1983, the defendant, without notice to the plaintiffs, and under the color of title arising by acquisition of the Beulah Moore rights began removing gas from the well and using the gas for fuel in defendant's manufacturing processes.

"17. That the defendant at the time of acquiring title to the land and of the Moore interest and at the time of removing the gas did not in fact know of the existence of and the fact that the affidavit described in paragraph 11 of these findings for the purpose described in paragraph 12 of these findings had been recorded because the abstractor who abstracted the title to the land omitted the affidavit from the abstract, but they did, at that time, have

reason to believe that the affidavit was to have been filed and if filed would have reserved in the plaintiffs their claims to all of the gas underlying the land then owned by the defendant.

"18. That the gas removed by the defendant has reduced their fuel cost since their commencement of its use by the amount of not less than $10,000.00 per month and that through August 31, 1984, the defendant has removed from the well 63026.2 million cubic feet and will use gas from August 31, 1984, and continuously thereafter at the approximate rate of 5400 million cubic feet per month.

"19. That the defendant will continue to use the gas unless enjoined and that but for this litigation they would not have recognized any interest whatsover in the plaintiffs and would not have compensated them for any part of the gas notwithstanding that they, at this time, concede that the plaintiff is at least the owner of one-eighth of the gas while contending that it, the defendant, owns the remaining seven-eighths.

"20. That the gas removed by the defendant has an average value, ambiguously ascertainable, of $3.96 a thousand [sic] cubic feet in use by the defendant at its manufacturing plant and a value at the well head of $2.25 a thousand [sic] cubic feet.

"21. That the defendant while ostensively acting under color of title in extracting gas and in so doing acting under its own privileged self-interest; nonetheless had fair warning that the plaintiffs laid claims to the gas which the defendants ignored notwithstanding their present acquiescence in the fact that the plaintiffs own at least one-eighth thereof; and, that while the defendants should not be amerced in a large sum which would have the effect of not deterring unlawful conduct but of enriching the plaintiffs beyond the compensatory restitution to which they are entitled; but however, the fact remains that the defendants ignored the plaintiffs rights in an obdurate fashion which renders them liable to compensate the plaintiffs for their cost of litigation."
(R. 214–19).

The conclusions of law were as follows:

A. That the plaintiffs are the owners in fee simple of all of the gas underlying the land.

B. That the defendants have converted the plaintiffs' gas and should make restitution therefore.

C. That the value of plaintiffs' gas converted by the defendants through August 31, 1984, is $141,808.95 for the period ending August 31, 1984, and that for each thousand cubic feet of gas removed thereafter the value shall be $2.25.

D. That the defendant should be enjoined from extracting gas from the well other than such gas as may be used upon the land by the defendant for domestic purposes in the dwelling house situate upon the land after October 31, 1984, and that if the defendant continues to extract gas thereafter that the value of that gas to be extracted commencing November 1, 1984, and thereafter shall be $4.00 per thousand cubic feet.

E. That the plaintiffs are entitled to recover the cost of this litigation and that evidentiary hearing should be scheduled to determine that cost.

F. That the Court withhold judgment entering now only its findings and conclusions until determination of litigation cost on behalf of the plaintiff and of the liquidated amount to be entered as a judgment on behalf of the plaintiffs upon discontinuance of gas extraction by the defendant, and that evidentiary hearing should be scheduled for determination of litigation costs and the final amount of gas extracted on November 8, 1984, at 2:00 p.m.

In essence, Plymouth urges us to determine that the lease executed by M.W. Howard and Peter Balmer, Jr., is still valid. Under that theory, the terms of the lease

are still controlling, and Balmer is entitled to no more than what he retained under the lease. That amount would be a one-eighth (⅛) share of the gas Plymouth converted to its own use. The remaining seven-eighths (⅞) share belongs to Plymouth, who traces its ownership from Beulah Moore. Finding of Fact, *supra*, ¶ 15. Beulah Moore purchased the surface rights to the property where the well was located from Balmer, Finding of Fact, *supra*, ¶ 10, and the subsurface rights from the assignees of the lease, Finding of Fact, *supra*, ¶ 14.

We decline to embrace Plymouth's theory.

■ Indiana law provides that any unused interest in coal, oil and gas, and other minerals shall be extinguished after twenty (20) years unless a statement of claim is filed. IC 1980, 32–5–11–1 (Burns Code Ed.). The aim of this statute is to eliminate title problems resulting from long held mineral interests which have remained inactive for extended periods of time. *Kirby v. Ashland Oil, Inc.* (1984), Ind.App., 463 N.E.2d 1127, 1129, *trans. den.* In the present case, the lease has been inactive but not for the statutory period. In the waning years of the 1960's, Howard Maudlin, one of the lessees, paid shut-in rentals.[1] This was a sufficient use of the interest to prevent an extinguishment of the lease under IC 1980, 32–5–11–3 (Burns Code Ed.). Indiana law also provides for oil and gas leases to be cancelled, which is the result sought by Balmer.

The cancellation statute at issue provides, in relevant part, that:

All leases for oil and gas heretofore and[or] hereafter entered of record in this state shall become null and void after a period of one (1) year has elapsed since the last payment of rentals thereon as stipulated for in such lease or contract, or since operation for oil or gas has ceased, both by the nonproduction of oil or gas and the nondevelopment of said lease, and, upon the written request of the owner of such lands, accompanied with the affidavit of such owner, stating that no rentals have been paid or received by such owner or any person, bank or corporation in his behalf for a period of one (1) year after they have come due, and that such leases and contracts have not been operated for the production of oil or gas for one (1) year, the recorder of the county in which such real estate is situated shall certify upon the face of such record that such leases and contracts are invalid and void by reason of nonpayment of rentals and is[are] thereby canceled of record, which request and affidavit shall be recorded in the miscellaneous records of said recorder's office.

IC 1980, 32–5–8–1 (Burns Code Ed.).

In a sentence that is cumbersome, at best, the statute mandates that cancellation of a gas lease can only occur if the lessor files an affidavit with the county recorder requesting that there be a notation in the record that such lease is cancelled. There must also be a qualifying one year period without rentals being paid. A qualifying period would be one year after the primary term of the lease has expired, or, if there has been production or development of gas continuing after the expiration of the primary term, one year after such activity ceases.

In the present case, an affidavit purporting to cancel the lease was filed with the county recorder on October 3, 1979. The first question we must resolve is whether, as a matter of law, there has been a qualifying one year period without rent.

The lease itself provided that:

It is agreed that this lease shall remain in force for a term of one year from this date, and as long thereafter as oil, gas, casing-head gasoline or any of them is being produced from said lease premises, or operations for drilling are continued as hereafter provided, or operations are continued for the injection of gas in a

---

1. In the event that gas was discovered but no market could be found for it, the lessee could cap the gas well and continue the lease by paying a determined amount of money as rent.

storage reservoir, water, brine, and any other fluids into subsurface strata.

(R. 308).

A very similar provision was at issue in *Barrett v. Dorr* (1965), 140 Ind.App. 295, 212 N.E.2d 29, 30, *trans. den.* In that case, which involved an oil lease, the court reviewed at length the effect of a failure by lessees to operate oil wells and market the product after oil had been discovered. There the court reasoned, and we agree, that:

> Here the primary or definite terms had expired and the rights of the lessees and those holding under them must exist, if at all, under the "thereafter" clause. The drilling and production of oil in the primary term created a determinable fee which is limited by the "thereafter" clause to so long as oil is produced and when oil is no longer produced, it expires by its own terms.

*Id.,* 212 N.E.2d at 33.

To determine if the lease at bar had expired by its own terms because production had ceased, the relevant inquiry is whether or not the lessees have made reasonable diligent efforts to conform to the terms of the lease by continuing production. *Id.,* 212 N.E.2d at 32.

In *Barrett,* the court determined that although there might have been mismanagement, efforts by the lessees, such as hiring a new operator and installing a new motor, did not indicate an intent to abandon the property. Thus, lessee's failure to actually produce oil for a certain period did not render the lease void. *See also Barr v. Sun Exploration Co., Inc.* (1982), Ind. App., 436 N.E.2d 821, *trans. den.* (both nonproduction of oil and gas and nondevelopment of the lease must be shown to prove cessation of production).

On its facts, the instant case differs from *Barrett.* Here, the lessees made no efforts to physically maintain the well, nor have they expended any money for that purpose. Only Balmer, the lessor, tended the well—arguably for his own interests and not for the lessees. In addition, the trial court found that after gas was discovered on the property, no serious effort was made by any of the lessees to market it. Finding of Fact, *supra,* ¶ 7.

■ Where there is evidence on the record to sustain a finding of fact, we will accept it. The trial court's findings that the lessees had not made a serious attempt to market the gas is supported by the record which reveals that between 1963 and 1979 the lessees had made few attempts to sell gas. The trial court's finding is neither one that reasonable minds would not make, nor is it contrary to law. Therefore, we will not disturb it on review. *Barr,* supra, 436 N.E.2d at 823; *Barrett, supra,* 212 N.E.2d at 36.

Our conclusion then is that because of the nonpayment of rent and lack of marketing efforts by the lessees, there has been a qualifying one year period. It follows that Balmer's affidavit triggered the cancellation statute.

Plymouth's counterargument was that because gas from the well was continuously used on the well property, the well was producing for purposes of IC 32–5–8–1, and consequently, there has not been a qualifying one year period after production has ceased.

We are not persuaded by this counterargument because of two provisions in the lease itself: one, a provision covering the situation where gas is discovered and no market for it can be found; and two, a provision allowing the lessor to use gas from the well for domestic purposes.

## A.

### Domestic Use

A provision in the lease provided that Balmer could use gas from the well for domestic purposes if he made the connections himself. Balmer made the necessary connections and later, with the lessees permission, increased his gas consumption by using it for grain drying and to operate a greenhouse on the property. Plymouth urges us to conclude that Balmer's use of gas should be considered as rent.

Plymouth has not referred us to any cases to support this contention, nor have we been able to discover any Indiana cases directly on point. There is, however, an Illinois case which is instructive. In that case the court decided to exercise its equity powers for the lessor where a well was shut-in for approximately eight years, and the lessees were not diligent in their efforts to market the gas. In addressing the use of gas for domestic consumption, the Illinois Appellate Court wrote:

> The purpose of an oil and gas lease is to obtain production. Unless lessee obtains production he cannot recover his drilling expense. Lessor depends upon production for receipt of the royalty provided in the lease. This purpose can only be accomplished if the production which can keep the lease effective for an indefinite future period is production in the ordinary sense of the term and hence results in royalties to the lessor.
>
> From a reading of the entire instrument it is evident that the royalty provision is a primary matter, while the provision for free gas, like the provision for burying lines below plow depth, is a secondary matter. Nor does the acceptance of free gas constitute an estoppel. Under the terms of the lease, lessor was entitled to free gas and to have the lease terminate at the end of the primary term unless there was production. These rights are not in the alternative.

*Metz v. Doss* (1969), 114 Ill.App.2d 195, 252 N.E.2d 410, 412–13, *reh. den; see also Pieszchalski v. Oslager* (1984), 128 Ill.App.3d 437, 83 Ill.Dec. 663, 470 N.E.2d 1083, *reh. den.* (citing *Metz*).

■ We adopt the reasoning espoused in *Metz*, and conclude that it is appropriate to apply it to the facts of the instant case. Balmer's use of gas was not the primary matter of the lease, therefore, the mere fact that gas was used for domestic consumption was not sufficient to alter our determination that the lease is no longer controlling. Additional support for this result is found in another provision in the lease which would govern the situation which gave rise to this litigation.

### B.
### Shut-In Rental

Another provision in the lease was that:

> In the event Lessee should encounter gas, and gas only, on said premises prior to the expiration of the primary terms, or any extension thereof, then Lessee may cap said gas well and continue this lease by the payment of $50.00 per year as a rental until a market can be found for such production.

(R. 312).

This provision afforded the lessees the opportunity to continue the lease by paying rent even though there was no market for the gas. The lessees, however, did not take advantage of this provision and failed to make shut-in rental payments save for the years 1963, 67, 68, and 69.

■ The lessee's failure to pay rent, together with their lax marketing effort, convinced us that the lease was abandoned. Certainly the lessees were aware of the above cited provision in the lease, since shut-in rentals were paid for certain years; and it follows that they knew that if rent was not paid the lease would expire.

Plymouth correctly points out that "to constitute abandonment, there must be an intention to abandon and an act or omission by which such intention is carried into effect." Both elements are present here.

Plymouth refers us to *Schaffner v. Benson* (1929), 90 Ind.App., 420, 166 N.E. 881, *trans. den.*, for the proposition that mere non-use does not evidence an intention to abandon property. In *Schaffner*, the court held that oil well casing left at a well site for fourteen months after the lease had expired was not abandoned. The court reasoned that no intent to abandon the well casing was evident since the owners had gone to the expense of removing the casing from the well, and finding a buyer willing to pay $2,500.00 for it. The *Schaffner* court distinguished laches from abandonment, and concluded that the owners of the

well casing had not relinquished its property with no purpose of again claiming it, and without concern as to who may subsequently take possession, *Id.*, at 423–24, 166 N.E. 881.

The facts at bar do not parallel those of *Schaffner.* Here the record supports the inference that the lessees intended to abandon their lease. From 1969 to 1979, the lessees had not taken any steps to maintain their gas interests, nor had they been actively seeking a buyer for the gas. In modern parlance, the lessees had "written-off" their investment in the gas. In 1979, the lessees interest in the gas lease was revived only because Plymouth offered them an opportunity to recoup some of their investment. By that time, however, it was too late for the lessees to transfer their interests because it had been abandoned earlier.

Plymouth also refers us to two other cases in which abandonment was not shown, *Southern Railway Co. v. Board of Commissioners* (1981), Ind.App., 426 N.E.2d 445, *trans. den.* and *Simkin v. New York Central Railroad Co.* (1966), 138 Ind. App. 668, 214 N.E.2d 661, *reh. den.* In those cases, the railroad companies were owners of property but had not used portions of it for long periods of time. In suits to declare the property abandoned, both courts held that the necessary intent to abandon was not present because mere proof of non-use was insufficient. We note the diversity between the above cited railroad cases and the case at bar.

In *Southern Railway* and *Simkin,* the companies had not relinquished its interests in the property. Each court noted that every year all taxes were paid on the property, and each company had planned to revive the line when business conditions made such a move economically practical. The lessees in the present case did not demonstrate a similar intention. There was testimony that in the negotiations between Plymouth, Balmer, and the lessees to transfer gas rights in 1979, the lessees were interested only in recovering money they had invested. In addition, unlike the

railroad cases, no expenditure of money was made by the lessees to demonstrate a continuing interest in the gas. Plymouth points out, however, that it was the lessees who posted bond for the well, a prerequisite for receiving a permit. Plymouth's argument is that abandonment could not occur while the well permit was in effect.

■ Pursuant to IC 1981, 13–4–7–19 (Burns Code Ed., Supp.1985), applicants for a permit to operate a gas well must post a bond. The mere payment of a bond does not alter our conclusion that the lease at bar was abandoned.

Bonds to operate a well must be filed before a permit can become effective. IC 1981, 13–4–7–21 (Burns Code Ed., Supp. 1985). In this case, bond was posted by M.W. Howard in 1962. In 1967, the permit was transferred to Mauldin, and in 1983 it was transferred to Plymouth. Each transfer involved the release of liability on behalf of the transferror when a new bond was posted by the transferree.

In 1967, when the well permit was transferred for the first time, hopes were high that a market for the gas could be found. The lessees did not intend to abandon their lease, and shut-in rentals were being paid. It was after 1969, when no more rental payments were made and serious marketing efforts ceased, that the lease was abandoned.

Plymouth's appeal is from a general judgment, and we will affirm the trial court's decision if any legal theory can be supported by the evidence. *Marshall County Readi-Mix, Inc. v. Matthew* (1984), Ind., 458 N.E.2d 219; *Litzelswope v. Mitchell* (1983), Ind.App., 451 N.E.2d 366.

Here the trial court's judgment that the lease had no effect can be affirmed using a number of legal theories, all of which are supported by the evidence. As discussed above, the lease expired by its own terms when shut-in rentals were not paid, or, in the alternative, the lease was abandoned. Finally, the trial court's decision could also be affirmed under a statutory cancellation theory.

Regardless of which theory is chosen, the result is the same—the lessees had no interest in the gas to deed to Beulah Moore in 1980. Moore only had the right to use gas for domestic purposes, which she had acquired from Balmer when she purchased the surface rights to the property where the gas well was located. This was the only gas interest that passed to Plymouth in 1981 when Plymouth bought Moore's property. *See Chaney v. Ohio & Indiana Oil Co.* (1904), 32 Ind.App. 193, 69 N.E. 477 (assignment of a gas and oil lease after lessee abandoned was ineffective since there was nothing under the lease capable of transfer).

## II.

### Damages

██ It was uncontroverted that the amount of gas Plymouth consumed was 63026.2 million cubic feet (mcf). Plymouth and Balmer vigorously disputed the value of that gas.

The trial court noted that the only market for Balmer's gas was Plymouth, who creatively transported the gas by truck from the well to its manufacturing plant. For that reason, the trial court found that the gas had a value of $3.96 per mcf if used at Plymouth's plant, and $2.25 per mcf if used at the well head. Finding of Fact, *supra*, ¶ 20. The trial court used the well head price for its calculation of damages, and arrived at a total of $141,808.95 for the value of the converted gas.

Plymouth wants us to determine that the damages award exceeded the reasonable worth of the gas, and challenges the sufficiency of Finding of Fact, *supra*, ¶ 20. Their reason for this belief is that the trial court did not consider Plymouth's capital and labor costs for transporting gas from the well head to its plant.

The Court of Appeals has previously addressed the argument forwarded by Plymouth in a case involving conversion of coal removed from an owner's mine:

"... where the trespass is the result of inadvertence or mistake, and the wrong was not intentional, the value of the property when first taken must govern; or if the conversion sued for was after value had been added to it by the work of the defendant he should be credited with this addition."

The rule in this State in cases of willful trespass is that the owner may recover his chattels in specie, so long as their identity can be determined, no matter how much value may have been added to them by the labor of the wrongdoer, and if the chattels have been converted he may recover the value at the time of the conversion in the form in which they then existed if he is content therewith, though he is entitled to the highest price at any time between the taking and the conversion. *Ellis v. Wire*, 33 Ind. 127. As soon as the coal in controversy in this case was severed from the soil, it became personal property, and for carrying it away and converting it to its own use the appellant became liable for such damages as might be assessed as in cases of other kinds of personal property. *Pittsburgh, etc., R.W. Co. v. Swinney, Exx.*, 97 Ind. 586 (598); 1 Hilliard, Torts, p. 501; *Hail v. Reed*, 15 B.Mon. [54 Ky.] 479.

While the coal lay in the vein it was a part of the realty; when it became severed, it became a chattel. The change in its condition did not change its ownership, it still belonged to the owner of the soil. He was entitled to recover its possession, and if this could not be done he was entitled to recover its value as a chattel. If a trespass is willful and intentional, the law will not permit the trespasser to profit by his own wrong. Whatever labor the trespasser voluntarily bestows upon property under such circumstances he must lose. If a trespass is the result of a mistake the damages may be reduced by the value of the labor expended upon it. The one is a positive aggressive wrong, the other a mere inadvertence.

*The Sunnyside Coal and Coke Co. v. Reitz, et al.* (1895), 14 Ind.App. 478, 484–

85, 39 N.E. 541, *reh. den.*, 14 Ind.App., 478, 43 N.E. 46.

We see no reason to differentiate between the conversion of coal and gas, and the *sunnyside* rules are applicable to the case at bar. Since the trial court did not make any allowance for Plymouth's labor and capital costs, the trial court applied the willful and intentional standard. See Finding of Fact, *supra*, ¶¶ 17, 19 and 21.

In our review of this damage award we will follow the teachings contained in *Hoosier Ins. Co., Inc. v. Mangino* (1981), Ind. App., 419 N.E.2d 978, *trans. den.* There it was written that:

> We presume that the award of damages by the trial court rested upon those allegations which were sustained by the evidence. *Prudential Company of America v. Executive Estates*, (1977) Ind.App. [174 Ind.App. 674], 369 N.E.2d 1117. Only when the evidence is without conflict and leads to but one conclusion and the fact finder reached a contrary conclusion will the Court of Appeals disturb the decision as contrary to law. *Thompson v. Lee*, (1980) Ind.App., 402 N.E.2d 1309.

*Id.*, at 981.

Here, evidence was presented regarding the quality of the gas at the well head, and the price of higher quality gas sold in the area by a public utility. Because of the unique circumstances of this case, *viz.*, that the only market for the gas was created by the converter, there was no other ascertainable standard which the trial court could have used to measure the value of the converted gas. Thus, the case at bar does not present us with a situation where the evidence is without conflict and leads to but one conclusion. For that reason, we cannot say, as a matter of law, that the damages were incorrect.

When sufficiency of the evidence is challenged, the reviewing court does not weigh evidence or resolve credibility of witnesses, but determines only if the verdict is sustained by substantial evidence of probative value. *Id.* The trial court in this case was presented with various estimates of the value of the converted gas, and it made detailed findings of fact. In ¶ 20 of those findings, the trial court clearly distinguished between well head use and the value of the gas used at Plymouth's plant. It does not appear to us that the trial court merely speculated when it valued the gas, but rather the fact finder carefully considered the evidence and made a fair and reasonable finding. We therefore defer to the trial court's valuation of the gas.

For that same reason we do not accept Balmer's contention that the damage award was insufficient. Balmer argues that Plymouth was a bad faith converter and should not be allowed to profit from his wrongful conversion. *Sunnyside, supra.* He points out that uncertainty as to the exact amount of damages should be resolved against the wrongdoer. *Floyd v. Jay Cty. Rural Elec. Membership Corp.* (1980), Ind.App., 405 N.E.2d 630, 633, *reh. den.*

We note that computation of damages is generally a matter within the trial court's discretion, *Indiana U. v. Indiana Bonding & Surety Co.* (1981), Ind.App., 416 N.E.2d 1275, *trans. den.; Sebasty v. Perschke* (1980), Ind.App., 404 N.E.2d 1200, *trans. den.*, and in a conversion case, the measure of damages is the fair market value of the converted property. *Coffel v. Perry* (1983), Ind.App., 452 N.E.2d 1066.

In the case at bar there is no market for the gas other than the market created by the converter. Given that fact, to value the gas at a higher rate than that which was used by the trial court would represent an unjust enrichment for Balmer, who otherwise would not be able to sell his gas. Our conclusion is that the trial court's judgment for the value of the converted gas should not be disturbed.

### III.

### Restitution in Kind

After the trial court entered its judgment, Plymouth filed a Motion for Relief From Judgment pursuant to Indiana Rules of Procedure, Trial Rule 60 (B). In that motion, Plymouth proposed to make resti-

tution for the converted gas by injecting a like quantity of similar gas into the well and paying Balmer loss of use damages.

Balmer opposed this motion and argued that Plymouth's offer to restore gas was nothing more than a sleight of hand maneuver. Balmer believed that Plymouth's plan to return gas would merely involve recycling gas from the same underground reservoir by removing it from a nearby well and rechanneling it to Balmer.

The trial court denied Plymouth's restitution in kind motion and wrote:

3. That upon defendant's motion for relief from judgment under Trial Rule 60 that the privilege of the defendant to mitigate damages by tendering back the property converted under the standard contained in the *Restatement of the Law of Torts, Second*, Sec. 922., while applicable in the case of tangible chattels, and perhaps to some intangibles which represent only rights to property; it cannot by its nature be applicable to the case of intangible chattels, if intangible be the correct concept to apply to gas, notwithstanding the fact that, and as the Court finds, it is feasible to restore the gas to the plaintiffs in the manner requested by the defendant. (See comment F. under Restatement, Sec. 922.)

(R. 271–72).

■ conversion is a tort involving appropriation of an owner's personal property to a tort-feasor's use and benefit. It occurs in exclusion and defiance of an owner's rights and under an inconsistent claim of title. *Howard Dodge & Sons, Inc. v. Finn* (1979), 181 Ind.App., 209, 391 N.E.2d 638, 640. Natural gas is property which can be converted if, as it was in the present case, it was extracted and consumed without the knowledge and consent of the owner. *Crystal Ice & Cold Storage Co. v. Marion Gas Co.* (1905), 35 Ind.App., 295, 74 N.E. 15.

■ Generally, in an action for conversion, the owner does not seek return of

property, but only the return of its value. *Coffel, supra,* 452 N.E.2d at 1069. Thus, damages are measured by market value of the property at the time of conversion. *Id.* Put another way, conversion is usually a forced sale of the appropriated property to the defendant.

■ Return of the value of the converted gas, and not the return of the gas itself, is the result sought by Balmer. Plymouth's complaint is that the trial judge ruled that he had no discretion in the decision to deny the T.R. 60 motion because of the intangible nature of the converted property. Plymouth argues that the trial judge misinterpreted substantive law, and should have exercised the court's discretionary power, either in favor of, or against the proposal on its merits.

A T.R. 60 motion is addressed to the trial court's equitable discretion, *Blichert v. Brososky* (1982), Ind.App., 436 N.E.2d 1165, and it must be remembered that the burden to affirmatively demonstrate that relief is necessary and just is upon the movant. *Plough v. Farmers State Bank of Henry County* (1982), Ind.App., 437 N.E.2d 471.

In the present case, Plymouth has not satisfied its burden. We have not been shown any authority for the proposition Plymouth advanced in its motion—that Indiana has adopted the Restatement of Torts, 2d, § 922. That section provides that in the discretion of the court, if the conversion was in good faith under reasonable mistake, damages may be mitigated by allowing the return of the converted chattel; even over the objection of the damaged party.

Assuming, *arguendo,* that Indiana had adopted § 922, Plymouth conceded that its motion may not be granted because in this case the necessary good faith may be lacking. *See,* Finding of Fact, *supra,* ¶ 21 (obdurate behavior finding).

Since Plymouth has not demonstrated that Indiana has or should adopt Restate-

ment of Torts, 2d, § 922, or that its requested relief is either necessary or just, *Plough, supra,* we conclude that the trial court's denial of the T.R. 60 motion was not an abuse of its discretion.

## IV.

### Attorney Fees

On November 8, 1984, the trial court awarded Balmer an attorney fee, relying on *Cox v. Ubik* (1981), Ind.App., 424 N.E.2d 127 (court can exercise equitable powers to award attorney fees when a party acted in bad faith). Recently, in *Kikkert v. Krumm* (1985), Ind., 474 N.E.2d 503, our state supreme court narrowed the obdurate behavior exception to the American Rule, which requires each party to the litigation to pay its own attorney fees. In *Kikkert* the court explained:

> The obdurate behavior exception only comes into play at the time a party files a knowingly baseless claim or at the time a party discovers that the claim is baseless and fails to dismiss it. Such conduct will constitute obdurate behavior if the trial court determines that it was vexatious and oppressive in the extreme and a blatant abuse of the judicial process.

*Id.,* at 505.

The *Kikkert* case, like the case at bar, was a property dispute, and similarly, the obdurate exception does not apply. Plymouth's intentional and illegal conduct gave rise only to a property claim, but not obdurate behavior. The obdurate behavior exception is only triggered when a party files a knowingly baseless claim, or after a party discovers that the claim is baseless and fails to dismiss it. *Id.* Such is not the case before us, so the award of attorney's fees is reversed.

The judgment of the trial court is affirmed in all things except the award of attorney fees which is reversed.

GARRARD and HOFFMAN, JJ. concur.