**Lonnie DAVIS, Harold Frazier, and United Pet Foods, Inc., Appellants (Defendants Below),**

v.

**EAGLE PRODUCTS, INC., Appellee (Plaintiff Below).**

No. 3–685–A–155.

Court of Appeals of Indiana, Third District.

Dec. 18, 1986.

Rehearing Denied Jan. 22, 1987.

Robert A. Pfaff, Robert W. Dunbar, Pfaff & Brotherson, Elkhart, for appellants.

Robert J. Palmer, E. Spencer Walton, Jr., May, Oberfell & Lorber, South Bend, for appellee.

STATON, Presiding Judge.

Lonnie Davis (Davis), Harold Frazier (Frazier), and United Pet Foods, Inc. (United) appeal from a judgment which awarded damages to Eagle Products, Inc. (Eagle). Eagle is a manufacturer of pet foods, and Davis and Frazier are former employees. They left Eagle in 1976 to form United, a rival pet food manufacturer.

Davis and Frazier present the following issues for our review:

(1) Whether there was evidence to support the trial court's finding that Davis and United misappropriated confidential information belonging to Eagle;

(2) Whether there was evidence to support the trial court's finding that Davis and Frazier breached a fiduciary duty owed to Eagle;

(3) Whether there was evidence to support the trial court's finding that some of Eagle's property was converted by Davis and Frazier;

(4) Whether there was evidence to support the damage award against Davis for compensation he received from Eagle;

(5) Whether certain testimony of Eagle's President was erroneously admitted over a hearsay objection;

(6) Whether the trial court erred by limiting the cross examination of two of Eagle's witnesses;

(7) Whether there was evidence to support the trial court's award to Eagle for compensatory damages, and;

(8) Whether the trial court erred by not awarding punitive damages to Eagle.

Affirmed in part, reversed in part.

## I.

### Confidential Information

■ The trial court made special findings of fact and conclusions of law pursuant to Indiana Rules of Procedure, Trial Rule 52(A). That rule provides that such findings shall not be set aside by an appellate court unless they are determined to be clearly erroneous. In making that determination, we will not reweigh evidence or re-evaluate witness credibility. Only evidence that supports the trial court's judgment and reasonable inferences drawn therefrom will be considered. *Best v. Best* (1984), Ind.App., 470 N.E.2d 84, 86. Too, we will not disturb the judgment unless, after a review of the entire record, we have a firm and definite conviction that a mistake has been made. *Extra Energy Coal Co. v. Diamond Energy and Resources, Inc.* (1984), Ind.App., 467 N.E.2d 439, 441.

The evidence supporting the judgment is that Davis was Vice President of Operations for Eagle until his discharge in September, 1976. In that capacity, he was responsible for the day-to-day management of the pet food plant including purchasing, production, and shipping. Davis also maintained daily accounting records for Eagle.

While still an Eagle employee, Davis made preparations to form United, a rival enterprise. Part of Davis' preparations included two meetings held in the state of Ohio with certain customers of Eagle. At one of the meetings, Davis presented a typewritten brochure detailing operating costs for the proposed venture. This brochure contained information regarding potential customers, tonnage projections, machinery needs, estimated costs of equipment, and operating income requirements. The data used to create this brochure was gleaned from Eagle's records.[1] On this point the trial court found as follows:

14. That in forming the competing organization and soliciting the customers of the plaintiff as investors or customers of the defendant, United Pet Foods, Inc., the defendant, Lonnie Davis, with the assistance of the defendant, Cheri Lynn, organized and directly used sales information and costing information which were not public knowledge, but were confidential knowledge peculiar to the plaintiff.

R. 1929.

The challenge to this finding is that the information disclosed by Davis in the brochure was not confidential; rather, it merely represented general knowledge acquired by Davis in the course of his employment with Eagle. This position contradicts a statement Davis made in a deposition

---

1. Davis' secretary testified that part of the information in the brochure came from Eagle's quarterly sales sheets and other records.

where he admitted that the tonnage information used in the brochure was confidential.

The President of Eagle testified that the tonnage information was kept in a safe in Eagle's office, and that few people had access to this information. It was not released to the public, and it was not available to Eagle's customers. Eagle's manufacturing costs were similarly treated, and they were also reproduced in Davis's brochure. Eagle's Vice President of Sales testified that this information was particular to his company, and it was critical because a competitor could use it to undercut Eagle with regard to price quotes. This point was underscored in the following finding by the trial court:

"... [the pet food formula] was particular only in its cost accounting function relating its ingredients to the price of the produce required to assemble the formula, that function being the costing figures alluded to in the preceding numbered finding [14]."

R. 1390.

■ *Eaton Corp. v. Appliance Valves Corp.* (1981), N.D.Ind, 526 F.Supp. 1172, set forth the test for identifying information that is confidential:

"1. The protected matter is not generally known or readily ascertainable.

2. It provides a demonstrable competitive advantage.

3. It was gained at expense to the employer.

4. It is such that the employer intended to keep it confidential."

Id. at 1179 (quoting from *Cherne Industrial Inc. v. Grounds & Assoc., Inc.* (1979), Minn., 278 N.W.2d 81, 90).

■ Our review of the evidence most favorable to the judgment, and in light of the factors set down in *Eaton*, reveal that the evidence is sufficient to support the finding that confidential information was misappropriated. The tonnage figures appearing in the brochure were prepared by Davis as part of his duties at Eagle, and these figures were not otherwise publicly disclosed. Moreover, the data was particular to Eagle's operation; it represented Eagle's actual experiences over time compiled by Davis from records belonging to Eagle. Contrary to Davis' contention, Eagle's quarterly sales sheets, the source of Davis' information, do not represent the type of general information acquired in the course of employment that would be permissible non-confidential information. Eagle's officers testified that the tonnage information coupled with the costing data Davis supplied, would allow a rival to undercut Eagle's price quotes thereby providing an unfair advantage to the competitor. That point is underscored by the fact that the information Davis used was kept in Eagle's safe in a room with limited access. Eagle's president, vice-president of sales, secretary, and Davis himself all acknowledged that the information was confidential.

We perceive the argument for reversal to be merely an attempt to have us view the evidence differently than did the trial court. It is not enough that the evidence might support some other conclusion; it must positively demonstrate that the trial court committed an error. *Campins v. Capels* (1984), Ind.App., 461 N.E.2d 712, 717; *trans. den.* Since the evidence in the instant case discloses a valid basis for the result reached, and the evidence supports the finding that confidential information was misappropriated, the first issue presents no cause for reversal.

II.

*Fiduciary Duty*

The trial court also found as follows:

16. That the effect of the solicitation of plaintiff's customers and incorporating them among the organization structure of the defendant, United Pet Foods, Inc., by requiring them, if they were to maintain their investment as shareholders in the latter corporation, to purchase their pet food needs solely of [sic] the defendant, United Pet Foods, Inc., was to divert from plaintiff many of its larger customers reducing plain-

tiff's sales and forcing it to reorganize its sales structure to recapture its place in the pet food market producing losses to the plaintiff for a period of approximately of [sic] two years.

17. That the effect of the solicitation of employees by the defendant, Harold Frazier, was that some employees left the plaintiff to become employees of the defendant, United Pet Foods, Inc., although most employees so solicited did not leave the plaintiff.

R. 1930.

■ Although these findings were contested in United's initial appellate brief, in its reply brief it concedes that Davis breached his fiduciary duty of loyalty by soliciting Eagle employees. *See Potts v. Review Board* (1985), Ind.App., 475 N.E.2d 708, 712, *trans. den.* Similarly, it was uncontroverted that while Frazier was still an Eagle employee, he solicited some of Eagle's other employees to work for United. This was a breach of the fiduciary duty Frazier owed to Eagle. *Id.* Consequently, there is no reason for this court to disturb what the trial court found.

### III.

#### Conversion

Another finding of the trial court was as follows:

18. That the defendants, Lonnie Davis and Harold Frazier, acting together converted to the use of United Pet Foods, Inc. miscellaneous parts, tools and supplies, of perhaps small but nonetheless undefined value.

R. 1930–31.

The evidence most favorable to the judgment is that following an inventory of Eagle's property made after Davis left, several items were determined to be missing. These items included a tachometer, several small motors, screw conveyors, and tape for closing pet food bags. At trial, Davis admitted that he kept the bag tape worth approximately $50.00.

Other witnesses familiar with both Eagle and United testified that equipment similar to that missing from Eagle was seen at United. One witness stated that he saw parts at United that were similar to ones belonging to Eagle, which in fact, he had helped to load onto Frazier's pickup truck. Too, another witness stated that while he was a United employee, he was ordered by Frazier to remove an identification tag from a motor. United argues that this evidence merely gives rise to a cause for suspicion, but it is not sufficient to support the trial court's finding. *Craig v. Citizens Trust Co.* (1940), 217 Ind. 434, 446, 26 N.E.2d 1006, 1012, *reh. den.* (mere suspicion of a fact cannot be considered as "evidence").

■ We are not persuaded by United's argument for a number of reasons. First, Davis admitted that he did keep the bag tape. That admission certainly supports the trial court's finding as it pertained to Davis. Second, although the evidence that Frazier converted some of Eagle's property was circumstantial, we are not convinced that the trial court's non-specific finding was clearly erroneous. It must be remembered, that the instant case was not one for conversion, rather it was a breach of fiduciary duty action. The unspecified conversions were incidental to the breach of fiduciary duty alleged by Eagle. Third, assuming *arguendo* that the evidence of conversion was purely speculative, this was not a case for conversion, as the pre-trial order made clear. Since there were other substantive findings to indicate that Davis and Frazier breached their fiduciary duty to Eagle, it cannot be said that the judgment rests only on a finding that was speculative. *See Monumental Life Ins. Co. v. Franko* (1985), Ind.App., 486 N.E.2d 608, 610 (it is appropriate to reverse a trial court if the judgment rests only on evidence that is no more than speculation or conjecture). Finally, we perceive the attack on this finding by the trial court to be an invitation for us to reweigh witness testimony and judge credibility.

## IV.

### *Compensation*

Bill Beaven was the person in charge of Eagle's operations before Davis. In fact, it was Beaven's proposal that caused Eagle to enter the pet food business. Eagle admitted that at the onset it had no experience running a pet food operation, and it relied heavily on Beaven's management. For his efforts, Beaven had an arrangement with Eagle that provided for him to become a substantial stockholder in the company and to receive fifty percent of the profits.

Davis and Cheri Lynn worked closely with Beaven, and it was his practice to give them a portion of his yearly bonus. Unfortunately, Beaven had cancer, and he died in November, 1975. On the first Monday after Beaven's funeral, Eagle met with Davis and Cheri Lynn to discuss the continuation of the business and their salaries. Because Eagle was obligated to Beaven's estate, it was not in a position to offer Davis, now a key managerial employee, a fixed percentage of the profits as a bonus. Instead, Davis was offered an increase in salary from $15,000.00 to $25,000.00 per year retroactive to July 1, 1975. Davis' retroactive pay was contingent upon Davis working in Eagle's best interest during the fiscal year ending June 30, 1976. Included in Davis's salary was a two week paid vacation, and an unspecified cash bonus at the end of the fiscal year.

Cheri Lynn's salary was also adjusted. She was given a retroactive increase, unaccompanied by any contingency. She was to receive an unspecified bonus at the end of the fiscal year as well.

In a memorandum dated September 14, 1976, Eagle published the bonus and retroactive pay figures each employee was to receive. These amounts were to be paid as of September 15, 1976. Davis directed Cheri Lynn to cut checks in those amounts before he stopped working for Eagle.

The trial court's finding was as follows:

19. That at the time of his discharge the defendant, Lonnie Davis, without authority, misappropriated fundings of the plaintiff causing to be paid to himself as an unauthorized bonus the sum of $11,500.00, retroactive pay in the sum of $3,696.00, and vacation pay in the sum of $960.00 to which he was not entitled and that he authorized payment to the defendant, Cheri Lynn, unauthorized bonus pay of $2,300.00 and retroactive pay of $500.00.

R. 1931.

Davis argues that the instant case should be controlled by *Tuthill Corp. v. Wolfe* (1983), Ind.App., 451 N.E.2d 72, *tran. den.* That case involved a former key employee who sought payment of a year-end incentive bonus. In *Tuthill*, the employer withheld the bonus after discovering alleged disloyal acts by the employee. In deciding that the employee who performed according to the terms of the plan was entitled to the bonus, our court reasoned that the main purpose of the incentive plan was not to ensure loyalty but to increase profits. We noted in *Tuthill* that there are other vehicles an employer could pursue to prosecute the allegedly disloyal employee than withholding an earned incentive bonus.

It is our opinion that our review of the instant case is controlled by *Tuthill*. Although the trial court's findings do not disclose specific terms of the bonus, its purpose was to provide Davis with sufficient incentive to continue working in Eagle's best interests after Beaven's death. Davis did not achieve the bonus' purpose, and the trial court "concluded that, He [Davis] crossed the line from simply preparing to compete with his employer, the plaintiff, and went into active competition with his employer, the plaintiff, and failed to exert his best efforts on behalf of his employer during his period of employment." R. at 1931.

That conclusion was not clearly erroneous since it was accompanied by numerous factual findings which are substantiated by the record in the instant case. Also, the trial court's conclusion was not contrary to the law expressed in *Tuthill* since Davis

did not perform according to the terms of the bonus.

■ Davis' retroactive pay was unauthorized. In his brief, Davis concedes that the retroactive pay was contingent upon continued service in Eagle's best interest.

■ The remaining portions of the trial court's findings regarding compensation, however, must be reversed. In *Die & Mold Inc. v. Western* (1986), 448 N.E.2d 44, 46, the court held that vacation pay is in the nature of deferred compensation in lieu of wages earned each week the employee works. In the instant case, Davis is entitled to his vacation, just as he earned his basic salary—only the bonus and retroactive salary increase were not earned. One of Eagle's executive officers testified that the vacation policy in effect during the fiscal year in question was to receive additional salary when time off was not taken. Thus, under *Die & Mold, Inc., supra,* Davis' right to vacation pay was vested, and the trial court erred by holding otherwise. *Hammond v. Conley, et al.* (1986), Ind.App., 498, N.E.2d 48.

■ We must also reverse that portion of the trial court's judgment regarding compensation paid to Cheri Lynn. Like Davis, under *Die & Mold, Inc., supra,* Cheri Lynn's right to vacation pay had vested. Unlike Davis' retroactive and bonus pay, no contingency was attached to Cheri Lynn's compensation, so under *Tuthill, supra,* her compensation was authorized.

Thus, that part of the trial court's judgment ordering Davis to pay Eagle $960.00 for his vacation pay and $2800.00 representing the money paid to Cheri Lynn must be reversed.

### V.

#### *Hearsay*

At trial, an executive officer of Eagle testified that during a conversation he had with Estelle Walker, Mr. Walker told him that he had heard that a motor missing from Eagle was at United. Although a hearsay objection to this testimony was made, it was overruled because Mr. Walker made a similar statement in a deposition, which was previously published.

Both parties stipulated that Mr. Walker was unavailable for trial. The trial court reasoned that since Mr. Walker could have been cross-examined during the deposition, his out of court statement qualified for an exception to the hearsay rule. *Patterson v. State* (1975), 263 Ind. 55, 324 N.E.2d 482 (extrajudicial statements of witnesses who testify and are subject to cross-examination are admissible as substantive evidence insofar as they are relevant).

■ It is well established that witness testimony in a judicial proceeding relative to an extrajudicial declaration by another, and which is offered for the purpose of proving facts asserted by the declarant, is hearsay. *Trustees of Indiana University v. Williams* (1969), 252 Ind. 624, 251 N.E.2d 439. Hearsay evidence is generally inadmissible; there are many exceptions, however.

The instant issue involves two pieces of hearsay from separate witnesses. One witness, an executive officer of Eagle, testified at trial that Mr. Walker said that he heard that a motor at United had come from Eagle. The other witness, Mr. Walker, stated in a deposition that he was aware of some "hearsay" to the effect that a motor at United had come from Eagle, but did not know that for a fact.

■ The testimony of both witnesses are clearly hearsay because they contain out of court statements by a third party offered to prove the truth of the matter asserted. *Williams, supra.* The question we must address is whether the hearsay defect in each statement can be cured. Eagle maintains that under the rule from *Patterson, supra,* the hearsay statements are admissible.

In *Carter v. State* (1980), Ind.App., 412 N.E.2d 825, *trans. den.* (Hoffman, J., concurring in result), this court discussed the *Patterson* rule. We determined that in order for hearsay to be admissible under

*Patterson* the out-of-court declarant must first testify, be confronted with the statement while on the witness stand, and be cross-examined about it. In the instant case, Eagle argues that in this hearsay situation the *Patterson* foundation set down in *Carter* was laid because Mr. Walker in his deposition was subject to cross-examination about the statement.

■ We need not pass on the technical point of whether the statements contained in Walker's deposition qualify under *Patterson,* because even if they had, the hearsay statement would still be inadmissible. Walker was not the author of the statement which was offered to prove the truth of the matter asserted—that the motor at United came from Eagle. In his deposition Walker merely repeated a rumor, and to use *Patterson* to convert a rumor into substantive evidence would be an unwarranted extension of that rule. *See D.H. v. J.H.* (1981), Ind.App., 418 N.E.2d 286, 294–95 (limitations of *Patterson* rule discussed). It is well known that the value of hearsay is dependent on the credibility of the out-of-court asserter, *Consolidated Rail Corp. v. Thomas* (1984), Ind.App., 463 N.E.2d 315, 320, and in this case, the author of the rumor that Mr. Walker related to Eagle's executive officer, who in turn, related to the court, was never subject to cross-examination about the statement, one of the *Patterson* safeguards.

■ Having determined that the hearsay testimony was inadmissible, we must also decide if reversal is the appropriate remedy. For the reasons set down in Part III of this opinion, *supra;* namely that the instant case was not for conversion and that judgment here does rest only on the unspecified conversion of a small motor, we determine that the admission of the hearsay statement into evidence was harmless, and not a cause for reversal of the trial court's judgment.

## VI.

### *Cross Examination*

Next, we must determine whether the trial court erred by placing restrictions on the examination of two Eagle witnesses. One of the witnesses, Eagle's president, had already been on the stand for three and one-half days when the trial court refused to allow recross examination by United. Although United acknowledged that the examination of witnesses is subject to the control of the court, *Blankenship v. State* (1984), Ind., 462 N.E.2d 1311, 1313, it argues that the trial court abused its discretion by terminating the recross-examination of this witness. United's argument is premised on its contention that new issues were raised during redirect testimony of Eagle's president.

Cross examination is the appropriate means to elucidate, modify, explain, contradict or rebut testimony given on direct examination, *Lambert v. State* (1983), Ind., 448 N.E.2d 288, 292. There is no right, however, to unbridled cross examination. *U.S. v. Wisniewski* (1984), 7th Cir., 741 F.2d 138, 142, *reh. den.* The trial judge has the duty to manage a trial, and since he is in the best position to observe the trial proceedings, it is the trial judge who should control the extent of cross examination. *Marbley v. State* (1984), Ind., 461 N.E.2d 1102, 1107. Thus, the trial judge has wide latitude in ruling on matters relating to cross examination, *Posey County v. Chamness* (1982), Ind.App., 438 N.E.2d 1041, 1045, and accordingly, a trial judge will be reversed only for an abuse of discretion. *Terre Haute First Natl. Bank v. Stewart* (1984), Ind.App., 455 N.E.2d 362, 368, *trans. den.* The above points of law apply equally to recross examination of redirect testimony. *See Aamco Transmission v. Air Systems, Inc.* (1984), Ind.App., 459 N.E.2d 1215, 1220, *trans. den.*

In order to establish an abuse of discretion, we must determine that the trial court's ruling was clearly against logic and effect of facts and circumstances before the court, as well as the reasonable and probable inferences to be drawn therefrom. *Condon v. Patel* (1984), Ind.App., 459 N.E.2d 1205, 1207. Moreover, absent a showing of prejudice, the Court of Appeals

will not reverse a discretionary decision of the trial court. *Antcliff v. Datzman* (1982), Ind.App., 436 N.E.2d 114, 121, *trans. den.*

■ In the instant case, we have not been told how United was prejudiced by not subjecting Eagle's witness to recross examination. United's brief and reply brief merely attempt to distinguish testimony elicited during redirect examination from testimony already given from this witness' long stay on the stand. Assuming, *arguendo*, that new areas of testimony were developed on redirect, United also had the burden of demonstrating an injury resulting from the trial court's denial of recross examination. United's burden of showing prejudice was substantial in light of the statements made by the trial court when it denied United permission to further examine Eagle's witness. At that time, the trial court responded to United's argument, that new matters were brought out during redirect, by remarking that there was nothing new, and to properly manage the trial, a limit to the examination had to be established. Given the fact that this witness had already been on the stand for three and one-half days, we conclude that the trial court did not abuse its discretion by terminating the examination of this witness. *Marbley, supra*, 461 N.E.2d at 1107.

United next complains that the trial court denied United's right to a full and fair trial by curtailing the cross examination of Eagle's expert witness. This witness' cross examination was prefaced by an admonishment by the trial court to avoid rambling and repetitious questioning. United's cross examination began at 9:00 a.m. and approximately half way through what was to be a three hour stint, the trial court again admonished United about the excessive length of its cross examination. The trial court then ordered that cross examination would stop at noon, at which time United could make an offer to prove so that the trial court could determine if further cross-examination was warranted. After that offer to prove was made, the trial court noted that the cross examination was going

nowhere, that the expert witness had already reiterated the fundamental basis for his testimony, and that United was already given ample time to bring out the credibility aspects of this witness.

■ Under the circumstances detailed above, we conclude that the trial court did not abuse its discretion by curtailing the cross-examination of Eagle's expert witness. We will not order a reversal based on this allegation of error because United's right to a fair trial was not substantially affected. *Terre Haute, supra*, 455 N.E.2d at 368.

## VII.

### *Damages*

The trial court found that Davis, Frazier and United were liable to Eagle for lost profits in the sum of $300,000.00. This amount represented the damage caused to Eagle by (1) the three or four month competitive edge United gained when Davis set up United while still employed by Eagle; (2) the disruption caused when Davis left and Eagle was essentially without management; and (3) the diversion of approximately 77% of Eagle's lucrative private label business to United.

■ In *Plymouth Fertilizer Co., Inc. v. Balmer* (1986), Ind.App., 488 N.E.2d 1129, *trans. den.*, this court had occasion to review a damage award. There, we noted that the computation of damages is generally a matter within the trial court's discretion. On review we will not weigh evidence nor judge the credibility of witnesses—a damage award will be disturbed only when the evidence is without conflict and leads to but one conclusion, and that conclusion is contrary to the one reached by the trial court. Too, we presume that the award of damages rests upon those allegations that were sustained by the evidence. *Id.* at 1139. Those points of law apply to the present case, thus, to prevail in its contention that the damage award should be reversed, United must show that the award was clearly erroneous or contrary to law.

In this case, United has not carried that burden.

Our review of the record reveals that various witnesses testified in great detail regarding Eagle's damages. In light of the varying damage estimates, this is not a case where the evidence is without conflict and leads to but one conclusion. Thus, we do not determine that as a matter of law, the damage figure awarded for lost profits was incorrect. *English Coal Co., Inc. v. Durcholz* (1981), Ind.App., 422 N.E.2d 302, 311, *trans. den.* (damage award within the scope of evidence will not be disturbed).

United also futilely attacks the damage award because it contends it is based on gross rather than net lost profits. *Farm Bureau Ins. Co. v. Dercach* (1983), Ind. App., 450 N.E.2d 537, *trans. den.* The trial court in this case heard many days of testimony on the subject of Eagle's lost profits, and each witness had a different perspective of Eagle's financial situation. It was for the trier of fact to judge witness credibility and weigh evidence, not the reviewing court, *Best, supra,* 470 N.E.2d at 86, and it is not an abuse of discretion for the trial court to choose one estimate of damages over another. Our review of the record in this case sustains our presumption that the award of damages rests on the evidence, *Plymouth, supra,* 488 N.E.2d at 1139, and that the trial court did not improperly rely on gross profits to fix the damage award figure. Consequently, we do not conclude that the award in this case was clearly erroneous, and it shall not be disturbed.

## VIII.

### *Punitive Damages*

In a cross appeal, Eagle claims that the trial court erred by denying its claim for punitive damages. We will reverse that decision if it is contrary to law, *viz.,* no reasonable person could draw the same conclusion from the evidence. *Orkin Exterminating Co. v. Traina* (1986), Ind., 486 N.E.2d 1019, 1022.

The denial of punitive damages was based on the trial court's conclusion that such an award was not in the public interest because only the present parties were impacted. Eagle's argument is that since a breach of trust was involved in this case, public policy would favor the imposition of punitive damages *F.D. Borkholder Co., Inc. v. Sandock* (1980), 274 Ind. 612, 618, 413 N.E.2d 567, 571, (consumer fraud); *Riverside Ins. Co. v. Pedigo* (1982), Ind. App., 430 N.E.2d 796, 809, *reh. den.* (misrepresentation and concealment by an insurer).

Those cases involved breaches of trust with members of the public by a building contractor and an insurance company. By contrast, the instant case did not involve a breach by one who occupies a position of trust with members of the public, rather it was restricted to the employee and employer context. With that distinction in mind, the trial court's decision does not seem unreasonable, hence we will not disturb it. *Orkin, supra,* 486 N.E.2d at 1022.

The judgment is affirmed save for that portion ordering Davis to repay Eagle $960.00 for vacation pay and $2800.00 for Cheri Lynn's bonus.

HOFFMAN and GARRARD, JJ., concur.