**T & W BUILDING COMPANY, Appellant (Defendant Below),**

v.

**MERRILLVILLE SPORT & FITNESS, INC., Appellee (Plaintiff Below).**

No. 37A03–8708–CV–00218.

Court of Appeals of Indiana, Third District.

Oct. 26, 1988.

Rehearing Denied Dec. 15, 1988.

Pamela P. Kosenka, Robert P. Forszt, Stults, Custer, Kutansky & McClean, Gary, for appellant.

Barry D. Rooth, Herbert S. Lasser & Assoc., Merrillville, for appellee.

STATON, Judge.

In 1984, Merrillville Sport & Fitness (Tenant) and T & W Building Company (Landlord) entered into a five (5) year lease agreement for space in one of T & W's buildings. However, due to a variety of problems with the premises, including the lack of heat, the Tenant gave notice and quitted the premises in February, 1985. Finding that constructive eviction occurred, the jury awarded Tenant $36,615.56 in damages. The Landlord contests this award, presenting the following issues for our review:

I. Whether the jury's finding of constructive eviction, based upon its determination that abandonment occurred within a reasonable time, was contrary to law?

II. Whether there is sufficient evidence supporting the damage award of $36,615.56 which was within the $13,000 to $54,000 range of damages presented to the jury?

III. Whether the amount of damages awarded is excessive?

IV. Whether the Tenant is allowed a refund of rents due during its occupation as an element of damages?

V. Whether the court erred in admitting Plaintiffs' Exhibit # 29?

Affirmed.

## I.

### Constructive Eviction

In contesting the finding of constructive eviction against its counter-claim, the Landlord asks us to review a negative judgment. The standard for reviewing a negative judgment is whether it is "contrary to law," i.e., whether the evidence can only lead to a conclusion opposite that found by the trial court. *Freiburger v. Fry* (1982), Ind.App., 439 N.E.2d 169.

While the theory of "constructive eviction" is definitively explained in *Talbott v. English* (1901), 156 Ind. 299, 59 N.E. 857, for our purposes, the concise summary found in *Sigsbee v. Swathwood* (1981), Ind. App., 419 N.E.2d 789, is appropriate. In *Sigsbee, supra,* we stated:

... If an act or omission by the lessor materially deprives the lessee of the beneficial use or enjoyment of the leased property, the lessee may elect to abandon the property and avoid further obligations under the lease. If the lessee so elects, the abandonment of the property must occur within a reasonable time after the act or omission.

*Sigsbee, supra,* at 794.

The Landlord focuses his argument upon whether the Tenant's abandonment occurred within a reasonable time. Referring again to *Sigsbee:*

Within a reasonable time means within a reasonable time under the circumstances of the case. That is, certain circumstances extend the time deemed to be reasonable....

Generally, *whether* the *abandonment was made within a reasonable time is a question of fact* for the trier thereof.... *Where*, however, *reasonable minds could not differ or the facts are undisputed,* the *question is one of law.* (Emphasis added.) (Citations omitted.)

*Id.* Thus, for the question of reasonableness to become a question of law, it must be shown that the facts are undisputed or that reasonable minds could not differ when interpreting those facts. Otherwise, whether abandonment was "reasonable" remains a question of fact.

The facts are not free from controversy. According to the lease, the Landlord had the duty to maintain the physical structure of the leased premises, as well as the electrical, mechanical, and plumbing equipment. The Landlord was also to keep the heating and cooling plant "in good order, repair and condition," and was to commence the required repairs as soon as reasonably practicable after receiving written notice. Additionally, the Landlord was to erect a masonry wall so as to separate the leased premises from the remainder of the building.

The Landlord argues that because the heat problem was "remedied" a month prior to the Tenant's abandonment, it did not abandon within a reasonable time. How-

ever, the Landlord mistakenly assumes that the lack of heat was the Tenant's only complaint, and that it was, in fact, remedied.

■ The Tenant complained of several problems throughout its tenancy. In its reply brief, the Landlord states "Tenant argues that there were other 'problems plaguing the premises'; but in Tenant's brief, as in the record, it is clear that Tenant's primary concern was the adequacy of the heat." (Appellant's Reply Brief, p. 12.) However, on the page referred to, we find that the Tenant actually stated:

"Because the Tenant did not receive what it had bargained for, and because none of the basic items such as eletricity [sic] and plumbing were operable, ... ... the electrical, heating, and plumbing remained in bad repair.... Also, the masonry wall was only partially completed allowing the heat to escape into the rest of the Landlord's building.

As a result of the Landlord's failure to effectuate the agreed upon repairs and improvements, the Tenant was losing members. (Emphasis added; citations to Record omitted.)

Appellee's Brief, p. 5.

The record is replete with similar complaints. For instance, upon being asked why the gym decided to close, Dolores Kussner replied,

Because he was losing his members, it was ice cold, they had no water, they had one plug in the entire building, and there was absolutely nothing being done.

Record, p. 643, 11. 27–28; 644, 1. 1. Additionally, we note that the Tenant's complaint, as well as the registered letter containing a list of its complaints, referred to a variety of items plaguing the premises. There is no indication that the Landlord rectified these concerns. Thus, while the lack of heat may have been a major concern during the winter months, it was not the Tenant's exclusive concern.

Arguendo, even if the Tenant was concerned only with the lack of heat, there is evidence that this problem was also left unremedied. Exhibits K & L (Record, pp. 970, 971) are two photos depicting the leased premises after the Tenant had left. The photos show at least ⅓ of the ceiling tiles to be missing, which would allow the heat to escape to the roof and contradict any assertions that the area was contained. Thus, although the masonry wall was completed to the roof on January 18, 1985, the jury had evidence before it indicating that the space was not contained as of the time the Tenant abandoned it and that the lack of heat was not alleviated.

Therefore, since the facts are not undisputed and reasonable minds could differ as to whether abandoning on February 19 occurred within a reasonable time, constructive eviction is a question of fact.

■ Finally, in response to the Landlord's assertion that the Tenant was obligated to mitigate its damages by doing its own repairs:

The party injured by the ... breach of a contract is bound to use reasonable exertion and diligence to protect himself from loss ... but where the party whose duty it is to perform has equal opportunity for performance and equal knowledge of consequences of nonperformance he cannot, while the contract is subsisting, be heard to say that plaintiff might have performed for him.

I.L.E., Vol. 9, Damages § 85 (1981). Here, there is evidence that the Landlord had knowledge of the faults on the premises, indicating that the jury's finding of constructive eviction was not contrary to law.

In a similar vein, the Seventh Circuit held that:

if assurances are made that performance will be forthcoming, or, if other circumstances indicate that the breaching party intends to perform, then, even though the contract has been breached, no duty to mitigate arises. (Citation omitted.)

*Shearson Hayden Stone, Inc. v. Leach* (7th Cir.1978), 583 F.2d 367, 371. The record contains testimony that the Landlord gave assurances that it would cure the problems. Again, since we must accept such evidence as true, we cannot hold that the court should have found an obligation

on behalf of the Tenant to mitigate damages.

## II.

### Damages Award

The Landlord incorrectly claims the damages award includes money expended by the Tenant in the ordinary course of business as well as speculative profits. Thus, the Landlord contends that there was insufficient evidence to support the jury's damages award.

In *Nahmias Realty, Inc. v. Cohen* (1985), Ind.App., 484 N.E.2d 617, *reh. denied, trans. denied,* we faced a damages award challenge which claimed the award was inadequate because the trial court considered improper elements in assessing the damages. In *Nahmias,* we stated that:

> We are bound by a very strict standard of review on questions of inadequate or excessive damages. [Citation omitted.] We may not reverse a damage award if it is within the scope of evidence before the trial court, and we shall not reweigh the evidence or judge the credibility of the witnesses who presented it. [Citation omitted.]

*Nahmias, supra,* at 619–620.

The damages are limited to those that are a consequence of the breach, *Ethyl Corp. v. Forcum–Lannom Assocs.* (1982), Ind.App., 433 N.E.2d 1214, 1221. Additionally, while the damages may include lost profits, these are limited to the *net* profits lost. *Ashland Pipeline Co. v. Indiana Bell Tel. Co.* (1987), Ind.App., 505 N.E.2d 483, 490, *reh. denied, trans. denied.*

Although exact mathematical precision is not the goal in computing damages, probative evidence must support the award; it cannot be based upon conjecture or speculation alone. *Nahmias, supra,* at 621. Further, we will presume the award is resting on sufficient evidence and will disturb it only where the evidence is without conflict and is contrary to the court's decision. *Davis v. Eagle Products, Inc.* (1986), Ind. App., 501 N.E.2d 1099, 1108, *reh. denied, trans. denied.* However, evidence must exist for measuring the plaintiff's loss of profits. *Ashland, supra,* at 489–490.

### Probative v. Non–Probative Evidence

> On appeal, non-probative evidence or trial court findings regarding such evidence may not be relied upon in the support of the judgment. The judgment must be supported by substantial evidence having probative value.

*Nahmias, supra,* at 622.

In the case before us, evidence relating to damages was admitted in two ways, one of them being a list of costs and expenses, marked as Exhibit 29. This list, titled "Total Consequential Damages," is as follows:

### TOTAL CONSEQUENTIAL DAMAGES

1. Moving–In & Fix–Up Expense:

| | | |
|---|---|---:|
| A. | Carley's Mayflower—Move Equip. | $1,062.23 |
| B. | Tri–State Supply—Carpet | 3,400.00 |
| C. | Carpet Installation | 1,275.00 |
| D. | Larson Lumber | 102.00 |
| E. | Illiana Disposal—Dumpster | 200.00 |
| F. | Business Sign Moved | 100.00 |
| G. | NIPSCO—Deposit (Elect. & Gas) | 600.00 |
| H. | Indiana Bell—Phone Installed | 93.00 |
| I. | Less Bergman–Assemble Equip & Mirrors | 200.00 |
| J. | Labor | 1,050.65 |
| K. | Misc. Supplies/Food for Laborers | 100.00 |
| L. | Wards—Paint | 1,299.41 |
| M. | Security Deposit | 1,500.00 |

2. Business Expense:

| | | |
|---|---|---:|
| A. | August Rent | 1,500.00 |
| B. | September Rent | 1,500.00 |
| C. | October Rent | 1,500.00 |
| D. | NIPSCO Bill (Gas & Electric) | 2,402.22 |
| E. | Refunds to Members | 3,340.00 |

| | | | | |
|---|---|---|---|---|
| F. | Gary–Hobart Water | | | $ 45.02 |
| G. | Andrean High School | | | 350.00 |
| H. | Gainer Bank – Interest | 5/85 | | 125.62 |
| I. | " " " | 8/85 | | 104.68 |
| J. | " " " | 11/85 | | 84.68 |
| K. | " " " | 2/86 | | 56.76 |
| L. | Gainer Bank – Interest | 5/86 | | 64.40 |
| M. | " " " | 8/86 | | 140.00 |
| N. | Illiana Disposal | | | 27.30 |

3. Moving–Out Expense:

| | | |
|---|---|---|
| A. | Carley's Movers | 618.34 |
| B. | Indianapolis Star | 73.50 |
| C. | South Bend Tribune | 41.25 |
| D. | Fort Wayne News | 51.00 |
| E. | The Herald | 64.00 |
| F. | Jenny Dye—Cleaning | 200.00 |
| G. | Move Business Sign | 100.00 |

4. Lost Members:

|  |  |  |
|---|---|---|
| 7/18/84 | 425 | |
| 1/31/85 | 178 | |
| | | |
| Lost Members | 247 | |
| Average Membership × | $125.00 | |
| | | |
| Total Lost | $30,875.00 | |
| Profit Margin | × 15% | |
| | | |
| 1 Year Lost Profit | $4,631.25 | |
| | ×3 | |
| | | |
| Total Lost Profits: | $13,893.75 | 13,893.75 |
| Total Consequential Damages: | | $37,264.81 |

Record, p. 768, Plaintiff's Exhibit 29.

The other numerical evidence relating to the amount of damages suffered by the plaintiff is found in the testimony. This included lost profits calculated in a variety of ways, one of which was based on membership fees. Vicki Kutsugeras testified as

| | | |
|---|---|---|
| 247 | Lost Members | : |
| ×125 | Average Fee | : |
| | | |
| $30,875.00 | | : |
| × .15 | Profit Margin | : |
| | | |
| $ 4,631.25 | | : |
| × 3 | Years lost via breach | : |
| | | |
| $13,893.75 | | : |

to the method of calculating lost profits based on 247 lost members, using the $125.00 average membership fee, a "conservative figure." Record, p. 772. However, the fee could have been as large as $225.00. This would present two (2) different totals:

| | | |
|---|---|---|
| 247 | Lost Members | |
| ×225 | Maximum Fee | |
| | | |
| $55,575.00 | | |
| × .15 | Profit Margin | |
| | | |
| $ 8,336.25 | | |
| × 3 | Years lost via breach | |
| | | |
| $25,008.75 | | |

The jury also had before it lost profits calculated on the basis of previous profit margins. On the one hand, evidence in the form of tax returns was presented which indicated that the plaintiffs made little or no net profits prior to their stay at the landlord's premises. However, the Tenant testified that the rent under its prior lease was half of its net profit figure, with a ceiling set at $1,500.00; the Tenant testified that it paid the $1,500.00 ceiling figure for the 18 months prior to its move into the Landlord's premises. If such was the case, this would leave the Tenant with $1,500.00 profit per month, which, when computed for a year's time is equivalent to $18,000.00. Multiplied by three years results in a figure of $54,000.00 in profits.

## Probative Evidence

For the damages award to stand, it must be supported by probative evidence, as defined above. Exhibit 29's list contains the bulk of non-probative evidence, primarily in the form of ordinary business expenses, which cannot be recaptured under a damages award for breach of contract.

As we concluded in the discussion of Issue I, the jury found, and we affirm, that constructive eviction occurred, putting the Landlord in the position of the wrongdoer. "Where there is doubt as to the exact proof of damages, such uncertainty must be resolved against the wrongdoer." *Nahmias, supra*, at 621. Furthermore, it is within the trial court's discretion to compute damages. *Davis, supra*, at 1108.

Removing the items of non-probative evidentiary value leaves the following items as those properly classified as evidence having probative value:

1. Moving–In & Fix–Up Expense:

| | | |
|---|---|---|
| B. | Tri–State Supply—Carpet | $ 3,400.00 |
| C. | Carpet Installation | 1,275.00 |
| L. | Wards—Paint | 1,299.41 |

2. Business Expense:

| | | |
|---|---|---|
| D. | NIPSCO Bill (Gas & Electric) | 2,402.22 |
| E. | Refunds to Members | 3,340.00 |

3. Moving–Out Expense:

| | | |
|---|---|---|
| A. | Carley's Movers | 618.34 |
| B. | Indianapolis Star | 73.50 |
| C. | South Bend Tribune | 41.25 |
| D. | Fort Wayne News | 51.00 |
| E. | The Herald | 64.00 |
| | TOTAL | $13,070.72 |

Thus, of the list found in Exhibit 29, items totalling $13,070.72 remain as probative evidence of consequential damages, and thus were properly before the jury for consideration.

The jury could also consider the testimony concerning lost profits. This would include the profits calculated on the basis of membership fees, calculated at both $13,000 and $25,000, as well as profits calculated on the basis of prior profits, be these the tax return figures indicating little or no profits, or the $54,000 figure based on prior rental fees.

As a court of review, we cannot reweigh evidence, nor judge witness credibility. While the range of profits varies greatly according to the testimony, as there was evidence supporting each calculation, we cannot say the finding was contrary to law, nor can we say it was based merely on speculation and guesswork. The jury had before it compensatory damages totalling approximately $13,000, in addition to profits ranging from $13,000 to $25,000, with a possibility of reaching as high as $54,000. Thus, while some evidence points to a lower amount of damages suffered than the amount awarded, other evidence indicates that the damages suffered exceeded the $36,615.56 figure actually awarded. Therefore, as the amount awarded is within the scope of the evidence, we will not disturb it.

## III.

### Excessive Damages

Strict guidelines govern the standard of review on questions of excessive damages. While an award will be upheld if it is within the scope of the evidence, *Greater Clark County School Corp. v. Myers* (1986), Ind.App., 493 N.E.2d 1267, 1270, *reh. denied, trans. denied*, the applicable standard for judging the amount awarded is as follows:

A judgment is not excessive unless the amount is so large it cannot be explained upon any reasonable hypothesis other than prejudice, passion, partiality, corruption, or some other improper element.

Since we have already stated that there was a reasonable basis for the jury's decision, we cannot say that the damages can be explained only by human motivations.

In further support of our opinion, we quote *McNall v. Farmers Ins. Group* (1979), 181 Ind.App. 501, 392 N.E.2d 520, *trans. denied*, 423 N.E.2d 593.

Where the evidence presented is conflicting as to the nature, extent, and source of the injury, the jury is in the best position to assess damages. In such cases, the verdict returned by the jury cannot be said to be based upon preju-

dice, passion, partiality or corruption or on the consideration of some improper element. (Citations omitted.)

*McNall, supra,* at 525. Since the evidence before the jury was conflicting, and the amount awarded is not unrelated to the evidence before the jury, we will uphold the jury's decision.

## IV.

### Rental Refund

Both parties agree that the Tenant paid rent only for the months of August, September, and October, never having paid rent for July, November, and December of 1984, nor for January of 1985. Although we affirmed the jury's finding that constructive eviction occurred, it was based on the fact that it occurred as of February 19, 1985. *Sigsbee, supra,* satisfactorily defines constructive eviction and the Tenant's options as follows:

> Eviction is ... constructive when the lessor, without intending to oust the lessee, does an act by which the latter is deprived of the beneficial enjoyment of some part of the premises, in which case the tenant has his right of election, to quit, and avoid the lease and rent, or abide the wrong and seek his remedy in an action for the trespass. But in every case of constructive eviction *the tenant must quit the premises if he would relieve himself from liability to pay rent;*
> ...

*Sigsbee, supra,* at 794, quoting from *Talbott, supra,* at 156 Ind. 307–308, 59 N.E. 860. Thus, to avoid paying the rent, the Tenant must abandon the premises. As long as he occupies the premises, he is liable for the rent.

In *Wellborn v. Society for Propagation of Faith* (1980), Ind.App., 411 N.E.2d 1267, we reached the same conclusion via a different route. We reasoned that as long as the Tenants, i.e., the Wellborns, were in possession, they were receiving at least a partial performance from the Landlord. There, too, the record was devoid of evidence indicating that the fair market value of the premises was less than the amount agreed upon in the lease. Quoting from The Restatement of Contracts, § 357, we

noted that, in *Sigsbee,* the Tenants owed restitution to the landlord if the landlord partially performed with that partial performance being a benefit to the Tenants, and the Tenants, knowing of the breach, nonetheless accepted the benefits of that partial performance. We concluded that staying in possession fulfilled these two elements. *Wellborn, supra,* at 1272.

■ Such was the case here. Testimony and other evidence indicated that the premises contained the same faults for a number of months. As long as the Tenant chose to endure those faults and occupy the premises, it was liable for the rent. Constructive eviction occurred when the Tenant abandoned the premises; at that time, the Landlord was no longer entitled to the benefits accruing to it under the lease.

Thus, while there was evidence that the premises did not conform to the lease, there was no evidence that the premises did not equal the $1,500.00 agreed upon as the monthly rental fee. Under *Sigsbee* and *Wellborn,* the Tenant was not entitled to a reduction or rebate of rent due during its occupation of the premises; the Tenant owed the Landlord the rental fees which it did not pay.

As stated above, the range of possibilities within which the damages could lie was as high as $54,000. Therefore, we cannot say that in reaching its decision, the jury did not consider the fact that the Tenant owed the Landlord for rents past due and compute the damages accordingly.

## V.

### Admission of Exhibit 29

In concluding that the award was within the scope of the probative evidence before the jury and upholding the amount of damages awarded, we need not discuss this issue.

> [W]e will sustain the trial court if its judgment regarding damages falls within the limits established by the probative evidence even though nonprobative material and incorrect legal principles were considered incidentally by the trial court in reaching its decision. (Citation omitted.)

*Greater Clark, supra,* at 1271. The record does not indicate that the jury relied on the non-probative evidence, nor did it need to do so to reach its decision. There is evidence supporting the damages awarded so as to remove them from the realm of mere speculation and conjecture, and to eliminate the possibility of the damages award being excessive.

AFFIRMED.

CONOVER, P.J., concurs.

GARRARD, P.J., concurs with opinion.

GARRARD, Presiding Judge, concurring.

I concur with the majority disposition of the issues in this case but note as to the introduction of exhibit 29 that the only objection raised at trial was that the exhibit represented a compilation and the landlord wished the opportunity to consider each separate item. Yet the landlord sought no opportunity to voir dire the witness concerning any of the items. Nor does its argument on appeal demonstrate that it was precluded from challenging any individual items. I would therefore simply find no prejudicial error demonstrated to the introduction of that exhibit.