**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**September 12, 2016**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

STEAK N SHAKE ENTERPRISES, INC.;
STEAK N SHAKE LLC,

      Plaintiffs-Counterclaim
      Defendants - Appellees,

v.

GLOBEX COMPANY, LLC;
SPRINGFIELD DOWNS LLC;
CHRISTOPHER BAERNS; LARRY
BAERNS; KATHRYN BAERNS;
CONTROL, LLC,

      Defendants-Counterclaimants -
      Appellants.

No. 16-1010
(D.C. No. 1:13-CV-01751-RM-CBS)
(D. Colo.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **HOLMES**, **BALDOCK**, and **MORITZ**, Circuit Judges.
_____

This appeal arises out of the termination of certain franchising and licensing

agreements. The former franchisees/licensees, their member, and their individual

guarantors appeal from the district court's grant of summary judgment to the

---

[*] After examining the briefs and appellate record, this panel has determined
unanimously to honor the parties' request for a decision on the briefs without oral
argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore
submitted without oral argument. This order and judgment is not binding precedent,
except under the doctrines of law of the case, res judicata, and collateral estoppel. It
may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1
and 10th Cir. R. 32.1.

franchisor and the licensor on the parties' competing claims of breach of contract.

Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

# BACKGROUND

This dispute involves multiple parties on each side. On the franchisor's side stand the franchisor, Steak n Shake Enterprises, Inc., and the owner and licensor of the Steak n Shake trademark, Steak n Shake, LLC (collectively, "Steak n Shake"). On the franchisees' side, there are Globex Company, LLC and Springfield Downs, LLC, who contracted as franchisees to establish Steak n Shake restaurants in Colorado. Control, LLC is the sole member of Globex and Springfield Downs. Christopher Baerns, Larry Baerns, and Kathryn Baerns are the principals and owners of Control and are individual guarantors of the companies' obligations. (Globex, Springfield Downs, Control, and the Baernses collectively will be referred to as "Franchisees.")

In September 2012, Steak n Shake and Franchisees entered into franchise and license agreements for Steak n Shake restaurants in Sheridan, Colorado, and Centennial, Colorado. Each franchise agreement provided that

> Franchisee acknowledges that maintaining uniformity in every component of the operation of the System is essential to the success of the entire chain of Steak n Shake Restaurants, including a designated menu (including the maximum, minimum, or other prices [Steak n Shake] specifies for menu items and mandatory promotions); uniformity of food and beverage specifications, preparation methods, quality and appearance; and uniformity of facilities and service.

Aplt. App., Vol. V at 1023, 1111. Franchisees expressly agreed "to comply with the entire System, as revised from time to time by [Steak n Shake]." *Id.* at 1023, 1111.

2

They further agreed "to serve, sell or offer for sale all of the (and only the) food and beverage products and merchandise that . . . are listed in the then-current standard menu or menus specified by [Steak n Shake]" and "not to deviate from [Steak n Shake's] standards, specifications and procedures for serving or selling the same (including, to the fullest extent the law allows, the maximum, minimum, or other prices for products and services offered and sold by Steak n Shake Restaurants and mandatory promotions) without [Steak n Shake's] prior written consent." *Id.* at 1036-37, 1124-25.

Under Section 11.1(A)(iii) of the franchise agreements, Steak n Shake could terminate the agreements immediately upon written notice, with no opportunity to cure, if "Franchisee knowingly sells products for a price in excess of any maximum prices established by [Steak n Shake] from time to time or knowingly fails to offer a mandatory promotion." *Id.* at 1057-58, 1145-46. Under Section 11.1(B)(i) of the franchise agreements, Steak n Shake could terminate the agreements with notice and a thirty-day cure period if "Franchisee fails to operate the Restaurant in compliance with the standards prescribed by [Steak n Shake]." *Id.* at 1061, 1149.

When Franchisees entered into the franchise agreements, they understood that Steak n Shake offered certain mandatory promotions, such as "4 Meals Under $4." With such promotions, the restaurant charged a fixed meal price for a combination of items, generally a sandwich and fries. Customers who did not want a meal, but only the sandwich or the fries, would pay a higher "à la carte" price for that item. In

3

May 2013, Steak n Shake rolled out a new $4 Menu that greatly increased the number of meals priced under $4.

Even before the new $4 Menu, Franchisees had been unhappy with their restaurants' profitability—they were losing money. In November 2012, Christopher Baerns had sent a letter to Steak n Shake proposing price increases for gourmet burgers. Getting no response, he then spoke with several Steak n Shake representatives about the need to raise prices. In January 2013, Mr. Baerns sent Steak n Shake a letter stating that his two choices were to close the restaurants or to implement his own pricing structure. He stated that Franchisees intended to offer menu items at à la carte prices instead of the meal prices. Steak n Shake made no written response to this letter.

The adoption of the new $4 Menu caused the Franchisees to implement their à la carte plan. As of May 1, 2013, Franchisees' dining rooms rang up items in the Point of Sale (POS) systems at the à la carte price unless a guest specifically requested the new $4 Menu pricing. Thus, for example, a sandwich and fries that were listed as $3.99 on the new $4 Menu were sold at Franchisees' restaurants for $5.08 ($3.29 for the sandwich and $1.79 for the fries). Franchisees' restaurants did not display the new $4 Menu marketing items, and Franchisees' operating manager testified that he removed marketing materials such as drive-through boards, flip cards, and window clings. Franchisees did not insert the new $4 Menu provided by Steak n Shake into the regular lunch and dinner menus, as required by the Summer 2013 promotions guide. Instead, Franchisees used their own altered menus that

4

reflected the higher prices for meals caused by using à la carte pricing. In addition, Franchisees' drive-throughs offered only one choice of drink—the "large" size, charged at a large-size price but served in a regular-size cup. Soon Steak n Shake began receiving complaints that the Sheridan and Centennial restaurants were overcharging customers.

On May 16, Elvin Leonardo, Steak n Shake's Manager of Standards Assessment, visited the two restaurants. Mr. Leonardo found that Franchisees were serving $4 Menu items but charging their own pricing. They were not displaying new $4 Menu marketing materials, were using different menus than those provided by Steak n Shake, and were ringing up items in the POS systems at the à la carte price rather than the meal price. On May 23 and 24, Steak n Shake disabled the à la carte functionality of the Franchisees' POS systems.

At the beginning of June, Kyle Whitney, Steak n Shake's Franchise Director, visited the restaurants. He reported that the Sheridan restaurant was not providing the new $4 Menu to customers and the Centennial restaurant was not displaying the new $4 Menu extender board or window clings at its drive-through.

On June 18, Steak n Shake e-mailed a notice of default to Franchisees' attorney. Steak n Shake advised Franchisees that they were in default of the franchise and licensing agreements for (1) failing to offer the new $4 Menu, (2) using menus other than Steak n Shake's approved menus, (3) altering marketing materials, and (4) charging prices greater than Steak n Shake's menu prices. Steak n Shake offered an opportunity to cure, giving Franchisees until June 20 to offer the new

5

$4 Menu to all patrons at all times and to display all marketing materials related to the new $4 Menu in compliance with the Summer 2013 promotions guide.

On June 19, Christopher Baerns sent a letter to Steak n Shake denying the allegations of the June 18 notice. The next day, June 20, he sent pictures of the drive-throughs. But Steak n Shake responded that the picture of the Sheridan drive-through did not show the $4 Menu extender board, as required, and Franchisees had to place the $4 Menu inside the regular lunch and dinner menus, display a $4 Menu window cling, and require servers to wear $4 Menu buttons. The picture of the Sheridan drive-through also showed that regular-size drinks still were blacked-out.

On June 21, Mr. Whitney visited the two restaurants. He reported to Steak n Shake that the Sheridan restaurant was not offering the new $4 Menu to customers, that he could not find any $4 Menus in the restaurant, and that no $4 Menu marketing materials were displayed. He attached pictures supporting that report. On his way back to the airport, Mr. Whitney also briefly visited the Centennial restaurant. There he saw neither the $4 Menu extender board at the drive-through nor the $4 Menu inserts in the regular menus.

On July 3, Steak n Shake terminated the franchise and license agreements for cause, effective immediately. Steak n Shake then filed suit in the district court to preclude Franchisees from continuing to operate as Steak n Shake restaurants. As relevant to this appeal, Steak n Shake claimed breach of contract and breach of guaranty, and Franchisees counterclaimed for breach of contract and breach of the implied covenant of good faith and fair dealing. The district court determined that

6

Franchisees had breached the franchise agreements and Steak n Shake's termination was proper under Section 11.1(A)(iii). It entered summary judgment in favor of Steak n Shake on its breach of contract claims and on Franchisees' contract and implied covenant counterclaims. This appeal concerns only this summary judgment with regard to the franchise agreements, not the disposition of the parties' other claims and counterclaims.

## DISCUSSION

We review a grant of summary judgment de novo, viewing the record and the reasonable inferences from it in the light most favorable to Franchisees, the non-moving parties. *See ClearOne Commc'ns, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 494 F.3d 1238, 1243 (10th Cir. 2007). Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[W]e review the district court's interpretation and determination of state law de novo." *ClearOne Commc'ns, Inc.*, 494 F.3d at 1243.

Franchisees argue that the district court erred in granting summary judgment because generally it is a question of fact whether a party has materially breached an agreement. They assert that there are genuine issues of material fact as to whether they even committed the alleged offenses cited in the notice of default. They also assert that the district court erred in applying Section 11.1(A)(iii), which allowed immediate termination, rather than Section 11.1(B)(i), which required Steak n Shake to give notice and a thirty-day opportunity to cure.

As the district court recognized, "where reasonable minds could not differ on an issue, the question becomes one of law for the court." Aplt. App., Vol. IV at 992 (citing *Thorne v. Bauder*, 981 P.2d 662, 664 (Colo. App. 1998), and *T & W Bldg. Co. v. Merrillville Sport & Fitness, Inc.*, 529 N.E.2d 865, 866 (Ind. App. 1988) (further citations omitted)).[1] Because Franchisees were not afforded a thirty-day cure period, the issue is whether reasonable minds could differ on (1) whether Franchisees breached their obligations under the franchise agreements and (2) whether Steak n Shake breached the franchise agreements by invoking termination under Section 11.1(A)(iii), which allows immediate termination if "Franchisee knowingly sells products for a price in excess of any maximum prices established by [Steak n Shake] from time to time or knowingly fails to offer a mandatory promotion." *Id.*, Vol. V at 1057-58, 1145-46.

## I. Overcharging

The district court held that Franchisees violated the franchise agreements, and therefore Steak n Shake was entitled to terminate them under Section 11.1(A)(iii), because Franchisees had knowingly overcharged for various items. Franchisees contend that they did not charge prices exceeding Steak n Shake's maximum prices because they "complied with the a la carte price specification afforded to them by Steak n Shake under the mandated POS system." Aplt. Br. at 22. "[Franchisees] did

---

[1] Before the district court, the parties disputed whether Colorado or Indiana law should apply to their contract claims. They do not raise this argument on appeal, however, and we need not decide which state's law to apply because both states' laws are consistent with regard to the relevant issues.

8

not knowingly charge prices that exceeded the maximum prices set by Steak n Shake because the maximum prices set by Steak n Shake are indeed the very prices used by [Franchisees], to wit, the a la carte pricing." *Id.* at 23.

Franchisees' arguments as to why they did not violate the agreements' pricing provisions are unconvincing. Appellants admit that they charged customers for meals at à la carte prices unless they specifically requested the new $4 Menu pricing. The effect was that customers paid more for their meals than the price that Steak n Shake had authorized—the new $4 Menu established a price of $3.99 for certain combinations of items, but Franchisees sold those items for $5.08. True, Steak n Shake permitted single items to be sold at the higher, à la carte price. But no reasonable mind could believe that the existence of à la carte prices, applicable when customers purchased items singly, allowed Franchisees unilaterally to increase the price of a meal. As the district court observed, "[t]he $4 menu provided for $3.99 *meals*, not a $5.08 combination of a la carte items which the Franchisees sold in the guise [of] meals." Aplt. App., Vol. IV at 989. Further, the new $4 Menu aside, the record also indicates that in their drive-throughs, Franchisees offered only a "large" drink, at a large-size price, but provided in a regular-size cup. This obviously constituted charging a price exceeding Steak n Shake's maximum price for a regular-size drink. And for substantially the reasons discussed by the district court, no reasonable mind could conclude that Franchisees acted other than "knowingly."

Franchisees further argue that, because Steak n Shake disabled the à la carte functionality of their POS systems on May 23 and 24, they were not out of

9

compliance with pricing when Steak n Shake issued the June 18 notice and opportunity to cure. Ultimately, however, we need not decide whether Steak n Shake was entitled to terminate the agreements under Section 11.1(A)(iii) based on Franchisees' pricing, even after such pricing was corrected, because Steak n Shake certainly was entitled to invoke Section 11.1(A)(iii) due to Franchisees' failure to offer the new $4 Menu promotion.

## II.     Offering the New $4 Menu and Marketing Materials[2]

The district court found it undisputed that Franchisees created their own menus and offered Steak n Shake's new $4 Menu only to guests who requested one. The court held that such conduct did not comply with the requirements of Steak n Shake's new $4 Menu promotion, so that Steak n Shake could terminate the franchise agreements under Section 11.1(A)(iii) for Franchisees' knowing failure to offer a mandatory promotion.

Franchisees argue that they in fact offered the new $4 Menu promotion, by furnishing an approved $4 Menu (and honoring the prices thereon) if a customer specifically requested it. We agree with the district court that "[s]uch 'offer' does not comply with the requirements under the Summer Promotion." Aplt. App., Vol. IV at 987. Franchisees rely on sales figures showing some sales of $4 Menu

---

[2] Franchisees argue that the failure to display marketing materials is grounds for termination only under Section 11.1(B)(i), not Section 11.1(A)(iii), and thus a thirty-day cure period would be required. We discuss the marketing materials in conjunction with Franchisees' failure to offer the new $4 Menu, however, because the failure to display marketing materials is relevant to whether Franchisees knowingly failed to offer a mandatory promotion, and thus whether Steak n Shake had grounds for immediate termination under Section 11.1(A)(iii).

10

items.  But the drastically lower volume of such sales—during a particular three-day period, three $4 meals per day at each of Franchisees' restaurants, compared to an average of fifty-four $4 meals per day at each corporate restaurant—leads to only one reasonable inference, that Franchisees were not *offering* the new $4 Menu, but were only begrudgingly honoring that menu when customers insisted on it.

Further, the undisputed material facts lead to the undeniable conclusion that Franchisees "knowingly" failed to offer the new $4 Menu promotion.  For example, communications among Franchisees not only discussed how to raise prices with the fewest chances of customers noticing, but also indicated that kitchen staff were trained not to make dining-room orders that were rung up as meals rather than as à la carte items.  Franchisees altered Steak n Shake's approved menus to reflect their à la carte pricing.  They did not insert the new $4 Menus in the regular lunch and dinner menus as required by the Summer 2013 promotions guide, and they removed new $4 Menu marketing materials from the restaurants.  As Franchisees' manager admitted, essentially he "got rid of everything . . . in both of [the] stores that would have alerted a customer to the fact that [Franchisees] were supposed to be offering $4 meals."  Aplt. App., Vol. II at 412.  At the least, the failures to display all required marketing materials continued even after Steak n Shake's June 18 notice.[3]  And

---

[3] Franchisees disputed this fact, but their response—that they displayed all marketing materials available to them, and that they ordered the other marketing materials on June 24, 2013—established that they in fact were not displaying all required marketing materials as of June 21.

11

Mr. Whitney reported, with corroborating pictures of the Sheridan location, that the $4 Menu was not being advertised at the restaurants on June 21, 2013.

In short, in light of the evidence of record, no reasonable mind could dispute that Franchisees knowingly failed to offer a mandatory promotion, and that Steak n Shake therefore properly terminated the franchise agreements under Section 11.1(A)(iii). The district court appropriately granted summary judgment to Steak n Shake.

## CONCLUSION

The district court's judgment is affirmed.

Entered for the Court


Bobby R. Baldock
Circuit Judge